AMERICAN IMMIGRATION LAWYERS
ASSOCIATION, et al., Plaintiffs,

v.

Janet RENO, Attorney General of
the United States, Defendant.

LIBERIANS UNITED FOR PEACE AND
DEMOCRACY, et al., Plaintiffs,

v.

Janet RENO, Attorney General of the
United States, et al., Defendants.

Elba Digna WOOD, et al., Plaintiffs,

v.

Janet RENO, Attorney General of the
United States, et al., Defendants.

Nos. CIV.A. 97–0597(EGS), CIV.A.
97–1237(EGS) and CIV.A. 97–
1229(EGS).

United States District Court,
District of Columbia.

Aug. 20, 1998.

**40**

Karen T. Grisez, Terrence A. Corrigan, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, Anna Marie Gallagher, Washington, DC, for American Immigration Law Foundation, Dominican American Nat. Foundation, Perlina Perez, Flor Aquino de Pacheco.

Karen T. Grisez, Terrence A. Corrigan, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for Elba Wood, Velia Isabel Hernandez de Sherwood, Meng Li, Charlotte Leaming, Nigel D. Wilson, Rosemary A. Wilson, Simcha Yechel Avi Ishak, Arlety Read, Valentina Kostine, Michael Wallace, Roberto Morenzo–Lopez, Florida Immigrant Advocacy Center.

Linda S. Wendtland, U.S. Dept. of Justice, Civil Div., Office of Immigration Litigation, Washington, DC, for Janet Reno.

*MEMORANDUM OPINION & ORDER*

SULLIVAN, District Judge.

Plaintiffs, including ten immigrant assistance organizations and numerous individual aliens, commenced these three separate lawsuits against Attorney General Janet Reno, Commissioner of the Immigration and Naturalization Service ("INS") Doris Meissner, and Director of Immigration Review Executive Office Anthony Moscato, to challenge the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), as well as the regulations, policies, and practices implemented under the new statute.[1] The Court has consolidated these cases for the purpose of resolving in one Opinion the related issues raised by the parties.

In their complaints, plaintiffs assert the following claims: that the Interim Regulations implementing IIRIRA violate the intent of IIRIRA; that the INS fails to follow the Interim Regulations; and that IIRIRA and the Interim Regulations violate due process, equal protection, International Law, and the First Amendment.

Pending before the Court are defendants' motions to dismiss all of plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Upon careful consideration of the pleadings, relevant statutes, case law, and the record herein, defendants' motions to dismiss are **GRANTED.**

## I. STATUTORY FRAMEWORK

The complexity and intricacy of IIRIRA, the Interim Regulations, and plaintiffs' challenges compel the Court to explain in detail the statutory framework of IIRIRA, prior to discussing and resolving the claims of the individual and organizational plaintiffs.

### A. Prior System

These consolidated lawsuits challenge the statutory provisions governing the admittance of aliens arriving at this country's borders. Prior to the implementation of IIRIRA, aliens arriving at a United States port of entry were required to establish to an immigration inspector's satisfaction that they were entitled to enter the United States. If an immigration inspector was doubtful of an alien's right to enter, the inspector referred the alien to a process known as "secondary inspection." During secondary inspection, an immigration inspector briefly interviewed the alien. At that time, the alien could withdraw her application for admission voluntarily. In the event the alien chose not to withdraw her admission application, the alien was entitled to an exclusion hearing. An exclusion hearing was held before an immigration judge, a decision-maker independent of INS. The alien had a right to counsel and was given a list of persons providing free legal services. An alien was then entitled to present evidence and to challenge the government's evidence. If needed, foreign language interpretation was provided by the government. The alien was then entitled to appeal an adverse decision of the immigration judge to the Board of Immigration Appeals.

### B. New System

#### 1. Purpose of IIRIRA

IIRIRA substantially amended the Immigration and Nationality Act of 1952 ("INA") and established a new summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation. The decision to adopt an "expedited removal" system was prompted by Congress's finding that "thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." H.R.Rep. No. 104–469, pt. 1, at 158 (1996). As noted in the conference report for IIRIRA, the purpose of the new removal procedures

> is to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted ..., while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by offi-

---

**1.** Plaintiffs in the *American Immigration Lawyers Association* ("AILA") case only named Janet Reno as a defendant.

cers with full professional training in adjudicating asylum claims.

H.R. Conf. Rep. No. 104–828, at 209 (1996).

## 2. The Inspection Process

To understand the "expedited removal" system which IIRIRA and its implementing regulations establish for certain aliens seeking initial entry into the United States, it is first necessary to understand the system for the admission of aliens in general.

Under the statutory scheme, an alien (a person not a citizen or national of the United States) is deemed to be seeking "entry" or "admission" into the United States if she "arrives" at a port of entry (such as an airport) and has not yet been admitted by an immigration officer. *See* INA § 235(a)(1), 8 U.S.C. § 1225(a)(1); 8 C.F.R. § 1.1(q). Upon her arrival, the alien is subject to "primary inspection," and potentially to "secondary inspection" as well. The INS has explained these procedures in the "Supplementary Information" accompanying IIRIRA's implementing regulations:

All persons entering the United States at ports-of-entry undergo primary inspection.... In FY 96, the Service conducted more than 475 million primary inspections. During the primary inspection stage, the immigration officer literally has only a few seconds to examine documents, run basic lookout queries, and ask pertinent questions to determine admissibility and issue relevant entry documents.... If there appear to be discrepancies in documents presented or answers given, or if there are any other problems, questions, or suspicions that cannot be resolved within the exceedingly brief period allowed for primary inspection, the person must be referred to a secondary inspection procedure, where a more thorough inquiry may be conducted. In addition, aliens are often referred to secondary inspection for routine matters, such as processing immigration documents and responding to inquiries.

62 Fed.Reg. 10312, 10318 (1997).

If the immigration officer determines during secondary inspection that the alien is inadmissible either because she possesses fraudulent documentation (INA § 212(a)(6)(C), 8 U.S.C. § 1182(a)(6)(C)) or no valid documentation (INA § 212(a)(7), 8 U.S.C. § 1182(a)(7)), the alien becomes subject to expedited removal. INA § 235(b)(1)(A)(i), 8 U.S.C. § 1225(b)(1)(A)(i). If the alien is found to be inadmissible for some other reason, she is referred for "regular," non-expedited removal proceedings conducted under INA § 240. *See* INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A).

In order to avoid expedited removal once an inspecting immigration officer has determined that the alien is inadmissible under either INA § 212(a)(6)(C) (fraudulent documentation) or § 212(a)(7) (no valid documentation), an alien must either show that she is a bona fide refugee seeking asylum or that she can claim a valid status as a U.S. citizen, permanent resident, previously admitted parolee, or previously admitted asylee.

Finally, IIRIRA provides that

[j]udicial review of any determination made under section 235(b)(1) is available in habeas corpus proceedings, but shall be limited to determinations of—

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under such section, and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 207 [8 U.S.C. § 1157], or has been granted asylum under section 208 [8 U.S.C. § 1158], such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

INA § 242(e)(2), 8 U.S.C. § 1252(e)(2). Further,

[i]n determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the

alien is actually inadmissible or entitled to any relief from removal.

INA § 242(e)(5), 8 U.S.C. § 1252(e)(5).

The habeas court "may order no remedy or relief other than to require that the petitioner be provided a ["regular," non-expedited removal] hearing in accordance with [INA] section 240." INA § 242(e)(4), 8 U.S.C. § 1252(e)(4).

## C. The Implementing Regulations

The Interim Regulations enacted in April 1997 to implement IIRIRA's new expedited removal system regulate how the inspecting officer is to determine the validity of travel documents, how the officer should provide information to and obtain information from the alien, and how and when an expedited removal order should be reviewed.

## 1. Determining the Validity of Documents

In ascertaining the validity of travel documents, the inspecting officer shall "[o]btain forensic analysis, if appropriate." INS Inspector's Field Manual ("Inspector's Manual"), ch. 17.15(b)(5) (*Wood* Defs.' Mot. Ex. 3). The officer is not permitted "to 'rush to judgement', or . . . to expeditiously remove an alien based on incomplete evidence." *Id.* Rather, "[i]f forensic analysis is required to establish that the alien is inadmissible, such analysis must be obtained before the Form I–860 [Notice and Order of Expedited Removal] is executed." *Id.* Additionally,

[a]ll officers should be especially careful to exercise objectivity and professionalism when refusing admission to aliens under this [expedited removal] provision. Because of the sensitivity of the program and the potential consequences of a summary removal, you must take special care to ensure that the basic rights of all aliens are preserved . . . . Since a removal order under this process is subject to very limited review, you must be absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her. . . . All officers should be aware of precedent decisions and policies relating to the relevant grounds of inadmissibility. . . . [I]t is im-

portant that . . . any expedited removal be justifiable and non-arbitrary.

*Id.,* ch. 17.15(a),(b); *see also* Mem. from INS Deputy Comm'r Chris Sale, "Implementation of Expedited Removal," Mar. 31, 1997, at 1 (*AILA* Defs.' Mot. Ex. 2)("Sale Memo")("Every officer must adhere strictly to required procedures to ensure that the rights of aliens are protected . . . .").

## 2. Providing Information

The Interim Regulations state that "[i]n every case in which the expedited removal provisions will be applied and before removing an alien from the United States," the inspecting immigration officer will create a "Record of Sworn Statement" using "Form I–867A/B," titled "Record of Sworn Statement in Proceedings Under Section 235(b)(1) of the [Immigration and Nationality] Act." 8 C.F.R. § 235.3(b)(2)(i). Specifically, in every case in which the expedited removal procedures will be applied, the inspecting officer is to read to the alien all the information contained on Form I–867A, record the alien's responses to the questions contained on Form I–867B, and have the alien make any necessary corrections and sign the statement. *Id.* Although the statute does not require it, the regulations provide that during the foregoing process, "[i]nterpretive assistance shall be used if necessary to communicate with the alien." *Id.*

### a. Form I–867A/B

Form I–867A/B is to be used in every case in which expedited removal procedures will be applied. Form I–867A/B indicates that aliens undergoing expedited removal procedures are to be given information concerning the asylum interview, regardless of whether they have yet articulated any fear of persecution or intent to apply for asylum. The form, which the inspecting officer must read to the alien in a language the alien understands, explicitly states:

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so

during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

Form I–867A (*AILA* Defs.' Mot. Ex. 1).

If upon being read the information and asked the questions in Form I–867A/B, the alien does not indicate any fear of persecution on return to her home country, or any intention to apply for asylum, the inspecting officer shall order the alien removed.

### b. Form I–860

The Interim Regulations further state that the inspecting officer "shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement." 8 C.F.R. § 235.3(b)(2)(i). On the Form I–860 (*Wood* Defs.' Mot. Ex. 2), the inspecting officer must "[c]heck the appropriate ground(s) of inadmissibility under which the alien is being charged ... and insert a narrative description of each charge." Inspector's Manual, ch. 17.15(b)(3). Any response by the alien to the charges "must be recorded either in the sworn statement or as an addendum to the statement." *Id.*

Although the statute does not require it, the regulations provide that "[i]nterpretive assistance shall be used if necessary to communicate with the alien." 8 C.F.R. § 235.3(b)(2)(i). The inspecting officer must "[r]ead and explain the charges to the alien in the alien's native language or in a language the alien can understand," and use an interpreter if "required to ensure that the alien understands the allegations and the

removal order." Inspector's Manual, ch. 17.15(b)(3).

### 3. Review

Under the regulations, any removal order by an inspecting officer "must be reviewed and approved by the appropriate supervisor before the order is considered final." 8 C.F.R. § 235.3(b)(7). "Such supervisory review shall not be delegated below the level of the second line supervisor, or a person acting in that capacity" who "may request additional information from any source and may require further interview of the alien." *Id.* "The supervisory review shall include a review of the sworn statement," *id.*, and "[t]he approving authority must be properly advised of all facts in the case in order to make an informed decision." Inspector's Manual, ch. 17.15(b)(3). The supervisory review is another calculated protection that the regulations provide, even though IIRIRA does not require it. *See* 62 Fed.Reg. at 10314.

## II. FACTUAL BACKGROUND

### A. Organizational Plaintiffs

The stated objective of three of the organizational plaintiffs is to assist refugees from particular countries in seeking asylum in the United States and to ensure that these refugees receive fair asylum hearings.[2] Six other organizational plaintiffs are based in particular localities and provide representation to immigrants from various countries as well as to legal residents of the United States who are afraid to travel abroad because of the new provisions of IIRIRA.[3] The remaining organization, the American Immigration Lawyers Association ("AILA"), is a national bar association of over 4,500 attorneys who practice immigration law. All of these organizations, however, share a common objec-

---

[2] These organizations are: Liberians United for Peace and Democracy ("LUPD")(Liberian refugees); National Coalition for Haitian Rights ("NCHR")(Haitian refugees); and World Tamil Coordination Committee (Tamil refugees).

[3] These organizations are: Florida Immigrant Advocacy Center ("FIAC")(representing indigent refugees in Florida); Human Rights Project ("HRP")(representing refugees in the Los Angeles area); Washington Lawyers' Committee for

Civil Rights and Urban Affairs ("Lawyers' Committee")(representing refugees in the Washington, D.C. area); New York Immigration Coalition ("NYIC")(representing refugees in the state of New York); Northern California Coalition for Immigrant Rights ("NCCIR")(representing refugees in the San Francisco Bay area); and Dominican American National Foundation ("DANF")(representing refugees and others in Dade County, Florida).

tive: they work to ensure that representation and assistance are provided to immigrants arriving in the United States.

## B. Individual Plaintiffs

In addition to the organizations, numerous individual plaintiffs have also commenced these proceedings. The vast majority of these individuals' claims are barred because they did not arise within 60 days of the implementation of IIRIRA, i.e. prior to May 31, 1997. *See infra* Section III.A for further discussion; *see also* INA § 242(e)(3)(B), 8 U.S.C. § 1252(e)(3)(B).[4] The Court, therefore, addresses those claims not barred by this 60–day statutory deadline.

Plaintiff Perlina Perez, a 70–year–old citizen of the Dominican Republic, and Plaintiff Flor Aquino de Pacheco, a 44–year–old citizen, also of the Dominican Republic, were summarily removed from the United States on or about May 3, 1997. Both Ms. Perez, who was coming to the United States to visit her ill daughter and grandchild, and Ms. Aquino de Pacheco possessed valid tourist visas. In addition to not being provided food or access to restroom facilities, and being detained for an extended period of time, nineteen hours in the case of Ms. Perez, both plaintiffs were denied access to counsel, family, and friends. The complaint also alleges that the plaintiffs were not advised of the reasons for their inadmissibility to the United States and were deprived of any meaningful opportunity to contest the charges against them. In addition, both women were ordered to sign a form in English, a language they neither read nor write. Because of the removal orders entered against them under INA § 235(b), both women are now barred from returning to the United States for five years, resulting in significant hardship and separation from U.S. family members. *See Wood* Am. Compl. ¶¶ 12–13, 58–59.

## C. Procedural Background

Under INA § 242(e)(3)(D), courts must expeditiously consider cases brought challenging the validity of the new system established by IIRIRA.[5] As the following chronology shows, this Court has taken Congress's mandate seriously while carefully considering plaintiffs' numerous and evolving claims regarding the new statute and the system it has brought about, especially given the serious nature of the allegations detailed in plaintiffs' complaints.

### 1. *AILA/Liberians* Complaints

The *AILA* complaint, 97–cv–597, was filed March 27, 1997, along with a motion for a temporary restraining order to prevent the Interim Regulations from taking effect on April 1, 1997. Plaintiffs claimed that the Attorney General failed to provide the required notice and comment period before promulgating the Interim Regulations under IIRIRA. After a hearing on March 31, 1997, on plaintiffs' motion for a temporary restraining order, this Court issued a preliminary injunction enjoining the Attorney General from implementing the Interim Regulations until April 6, 1997. *See* Prelim. Inj. of Mar. 31, 1997. The government filed an interlocutory appeal, which the Court of Appeals dismissed as moot on June 18, 1997.

On April 23, 1997, the government filed a motion to dismiss in the *AILA* case and a hearing on the motion was scheduled for June 26, 1997. Subsequently, however, the *Liberians* complaint, 97–cv–1237, was filed on May 30, 1997. Because the claims raised in that complaint were similar to the claims in *AILA*, the two cases were consolidated. *See* Order of June 5, 1997. In order to address the *Liberians* complaint together with the *AILA* complaint, the government

---

4. In full, this section states
 Any actions instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure ... is first implemented.
 INA § 242(e)(3)(B).

5. In full, § 242(e)(3)(D) of the statute, titled "Expeditious Consideration of Cases," states

It shall be the duty of the District Court, Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.
8 U.S.C. § 1252(e)(3)(D).

was given additional time to file a motion to dismiss the "new" claims raised in the *Liberians* complaint and the hearing on the government's motion to dismiss was rescheduled to August 12, 1997.

An "Amended/Supplemental Complaint" was then filed by the *AILA/Liberians* plaintiffs on September 13, 1997, seeking to add new plaintiffs and prompting a supplemental motion to dismiss by the government, which was filed on October 6, 1997. Following the government's supplemental motion, an amicus brief was filed on October 31, 1997 by immigration law professors in support of plaintiffs' challenge. A hearing on the government's supplemental motion was held on November 7, 1997.[6]

### 2. *Wood* Complaint

The *Wood* complaint, 97–cv–1229, was filed on May 30, 1997, raising similar but not identical claims to the *AILA* and *Liberians* complaints and raising claims on behalf of differently situated plaintiffs. Plaintiffs' attorney, however, did not enter an appearance in this case until August 1, 1997. Plaintiffs then filed an amended complaint on August 28, 1997, and the government filed its motion to dismiss on October 10, 1997. Although the hearing on the government's motion was originally scheduled for December 22, 1997, the hearing was postponed and subsequently held on January 12, 1998 after plaintiffs requested a continuance due to an emergency. Subsequently, plaintiffs filed notice of the Supreme Court's decision in *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, —— U.S. ——, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998), and on March 27, 1998, the parties submitted supplemental memoranda

on the applicability of that decision to the issues of standing in these cases.

## III. JURISDICTION

Defendants have first moved to dismiss plaintiffs' actions pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. In arguing that this Court lacks subject matter jurisdiction, the government maintains that the statutory provisions of IIRIRA which provide for judicial review do not provide for this Court's jurisdiction over these actions. The government further maintains that most individual plaintiffs lack standing, and that all the organizational plaintiffs lack standing to sue either in their own right or on behalf of their purported members.

### A. IIRIRA Jurisdictional Provisions

■ The government makes several arguments that this Court does not have jurisdiction over these cases. The only argument the Court will address here is IIRIRA's 60–day statutory deadline.[7]

Any action challenging the validity of the expedited removal system "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." INA § 242(e)(3)(B). Here, since the regulations were "first implemented" on April 1, 1997, the government argues that any action must have been filed by May 31, 1997. While the original complaints in these cases were filed before May 31, 1997, the amended complaint in the *Wood* case adding several individual plaintiffs was not filed until August 28, 1997. Moreover, the plaintiffs added in the *Wood* case were not subject to expedited removal until after May 31, 1997. Thus, the government argues that the Court lacks jur-

---

**6.** Subsequent to the November 1997 hearing, the parties filed supplemental briefs on November 21, 1997, regarding both the issue of aliens' right to counsel, under the regular procedures and under the expedited system, and the issue of equitable tolling, and on November 26, 1997, regarding the issues of discovery requested by plaintiffs and the administrative record in this case.

**7.** The government also argues that this Court lacks jurisdiction over these cases because only an individual who has had a summary removal order entered against her may bring an action

under § 242(e)(3). However, the Court need not reach this issue since the only two plaintiffs who are properly before the Court, Ms. Perez and Ms. Aquino de Pacheco, each had a summary removal order entered against her.

Finally, the government also argues that § 242(e) precludes this Court from enjoining or restraining the operation of the summary removal system as plaintiffs request. Since the Court will not grant the relief requested by plaintiffs, the Court will not address this jurisdictional argument.

isdiction over the new individual plaintiffs added in the amended *Wood* complaint whose claims arose after May 31, 1997. The Court agrees.[8]

The Court finds that the 60–day requirement is jurisdictional rather than a traditional limitations period. The Court reaches this conclusion because Congress designed the statute so that the 60 days ran from a fixed point, the initial implementation of the challenged provisions, rather than from the date of application of IIRIRA to a particular alien. Thus, the new plaintiffs added in the amended *Wood* complaint are time barred since their claims were filed after May 31, 1997.

Plaintiffs argue that the amended complaint "relates back" to the date of the original complaint. Where a statutory deadline is jurisdictional, however, no "relation back" under Rule 15(c) can occur. *Lamb v. United States Postal Serv.*, 852 F.2d 845, 847 (5th Cir.1988); *Resolution Trust Corp. v. Olson*, 768 F.Supp. 283, 285 (D.Ariz.1991).[9] Thus, the new plaintiffs in the amended *Wood* complaint are time barred.

The only individual plaintiffs whose claims are properly before this Court are Perlina Perez and Flor Aquino de Pacheco. Because these two plaintiffs were removed before May 31, 1997, and they brought challenges to their removal before that date, these two plaintiffs meet the jurisdictional requirements of IIRIRA.

## B. Standing

### 1. Individuals

■ The Court finds, and indeed the government concedes, that Ms. Perez and Ms.

Aquino de Pacheco have standing.[10] *See Wood* Defs.' Mot. at 25–26. Because both of these plaintiffs were visa holders, however, they can only challenge IIRIRA and the new system insofar as it relates to them as visa holders and cannot challenge any of the regulations solely applicable to refugees seeking asylum or to status claimants.

### 2. Organizations

In order to establish standing to challenge the new expedited removal procedures contained in INA § 235(b)(1), 8 U.S.C. § 1225(b)(1), and the implementing regulations, the organizational plaintiffs must demonstrate: a) standing in light of prudential considerations, *see Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), and b) Article III standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

### a. Prudential Standing Requirements

■ To establish standing in light of prudential considerations, plaintiffs must show that they fall within the "zone of interests," i.e. that "the interest sought to be protected by the complaint [is] arguably within the zone of interests to be protected or regulated by the statute [or constitutional guarantee] in question." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, —— U.S. ——, ——, 118 S.Ct. 927, 933, 140 L.Ed.2d 1 (1998); *Association of Data Processing Serv.*

---

**8.** It is important to note that plaintiffs have never argued that this 60–day deadline is unconstitutional because it acts as a bar to judicial review.

**9.** Even if the 60–day period was a limitations period, the amended complaint would not relate back. With the exception of plaintiff Kostina, all of the claims of new plaintiffs added in the amended complaint arose after May 31, 1997. A pleading "that relies on facts that did not occur until after the expiration of the statute of limitations may not relate back." 3 *Moore's Federal Practice* § 15.30 at 15–111. Moreover, these plaintiffs' claims do not "arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading" because virtually all of the events added to the

amended complaint occurred after the filing of the original complaint and allege separate violations. *See* Fed.R.Civ.P. 15(c)(2); *see also Moore v. Baker*, 989 F.2d 1129, 1132 (11th Cir.1993); *Wiren v. Paramount Pictures*, 206 F.2d 465, 467–68 (D.C.Cir.1953), *cert. denied*, 346 U.S. 938, 74 S.Ct. 378, 98 L.Ed. 426 (1954).

**10.** While plaintiff Jane Doe may have had standing, her claims are now moot. The INS paroled Ms. Doe into the United States and will provide her with a full asylum hearing. Since she is not being removed under the new expedited removal procedures and is already receiving as much relief as the Court could have granted her, her claims are moot.

*Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Organizational plaintiffs bear the same burden as individual plaintiffs to demonstrate that they satisfy prudential standing requirements. *See INS v. Legalization Assistance Project of Los Angeles County Fed'n of Labor [LEAP],* 510 U.S. 1301, 114 S.Ct. 422, 126 L.Ed.2d 410 (O'Connor, Circuit Justice 1993) (applying general prudential standing requirements to organizations and concluding that organizations were outside the zone of interests); *Federation for Am. Immigration Reform [FAIR] v. Reno,* 93 F.3d 897, 904 (D.C.Cir.1996)(same), *cert. denied,* —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

Congress may modify or abrogate the zone of interests test. *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1160, 137 L.Ed.2d 281 (1997); *see FAIR,* 93 F.3d at 902 ("As long as the requirements for Article III standing are met, Congress may permit suit by persons who would otherwise be barred by prudential standing requirements.") (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). However, "[a]n indication of congressional purpose to benefit the would-be plaintiff" is not needed to establish that plaintiff falls within the zone of interests. *National Credit Union,* 118 S.Ct. at 935.

Plaintiffs maintain that Congress, by enacting § 242(e)(3), intended to allow actions to be brought by more than just individual aliens subjected to expedited removal orders and, thus, that Congress either negated or expanded the zone of interest to include immigrant assistance organizations such as the organizational plaintiffs in this case. In so arguing, plaintiffs point to the statutory scheme and argue that this is the only reasonable interpretation of § 242(e)(3), as it is clear that Congress specifically intended for judicial review of the expedited removal system and for such review to be expedited.[11]

Moreover, plaintiffs argue that the language of § 242(e) does not expressly *preclude* parties other than individual aliens from bringing actions under § 242(e)(3). And, although neither the language of the statute nor the legislative history expressly provides that Congress intended organizations such as plaintiffs to bring this action, this circuit has held that "an affirmative signal of Congressional intent to permit a suit" is not required to meet prudential standing requirements. *FAIR,* 93 F.3d at 902. The circuit has also held, however, that "the absence of a clear indication of congressional intent to forbid the suit does not automatically confer standing on the plaintiff." *Id.* (citing *National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1052 (D.C.Cir.1989), *cert. denied,* 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990)). Under the circumstances of this case, this Court must consider other factors which might determine congressional intent. The most logical approach is to consider the two competing interpretations of the statute and to attribute the more reasonable interpretation to Congress.

An important issue to consider is whether Congress intended that persons other than individual aliens subject to removal orders be able to bring actions under § 242(e)(3). Plaintiffs argue that Congress would not have enacted a statutory scheme under which aliens who were summarily removed would only have 60 days after the implementation of the regulations to bring a suit challenging the validity of the expedited removal system. Undoubtedly, judicial review under such circumstances would be, at best, improbable and, at worst, illusory since such plaintiffs would find it difficult to file an action in the appropriate court (the United States District Court for the District of Columbia), within the appropriate time (prior to May 31, 1997), once they had been returned to their country of origin after being summarily removed from the United States. Like plaintiffs, the

---

11. The legislative history provides the following: [U]nder the conference report, there could be *judicial review of the process of implementation,* which would cover the constitutionality and statutory compliance of regulations and written policy directives and procedures. It was very important to me that there be judicial review of the implementation of these provisions. Although *review should be expedited, the INS and Department of Justice should not be insulated from review.* 142 Cong. Rec. S11,491 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch) (emphasis added).

Court will assume that Congress did not intend to create a false impression that it intended that there be judicial review. Plaintiffs maintain that the only other possible conclusion that can be drawn from the statutory scheme of § 242(e)(B) is that Congress specifically intended that immigrant organizations such as the organizational plaintiffs here bring the actions challenging the validity of the system.

"[W]ithout either a clear indication of congressional intent or any obvious tie-breaking rule," *FAIR*, 93 F.3d at 903, this Court concludes that Congress intended to permit plaintiffs who could satisfy Article III standing requirements to bring an action under § 242(e)(3). The Court reaches this conclusion from the fact that Congress intended that there be judicial review within a 60–day period and the fact that such an action would probably not be brought in time if Congress intended that only aliens subject to summary removal orders be allowed to bring such an action. Thus, the Court concludes that the organizational plaintiffs satisfy prudential standing requirements. The Court will now turn to Article III standing requirements.

### b. Article III Standing Requirements

#### i) Organizational Standing

■ Organizational standing refers to an organization's right to sue on its own behalf rather than through its members. "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990); *see also Common Cause v. Federal Election Comm'n*, 108 F.3d 413, 416 (D.C.Cir.1997) (stating that an organizational plaintiff may have standing to sue on its own behalf "to vindicate whatever rights and immunities the association itself may enjoy").

■ Article III requires a plaintiff to show (1) injury in fact, (2) a causal connection between the injury and conduct complained of, and (3) the likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The constitutional "injury in fact" requirement is satisfied when the organization incurs a "distinct and palpable injury." *Warth*, 422 U.S. at 501, 95 S.Ct. 2197; *Center for Auto Safety · v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1331 (D.C.Cir.1986). The injury cannot be " 'conjectural' " or " 'hypothetical.' " *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). In other words, "[a]llegations of possible future injury do not satisfy the requirements of Article III." *Whitmore*, 495 U.S. at 158, 110 S.Ct. 1717.

■ Plaintiffs allege that the challenged procedures have resulted in two types of injury: (1) they will be required to divert resources to find other channels to communicate with "refugees," and (2) they will be deprived of clients and the opportunity to fulfill their missions. For example, plaintiffs FIAC and the Lawyers' Committee allege that they "*may* expend time, money and other resources, or divert resources, in an attempt to gain access to asylum seekers." *AILA* Mot. for TRO at 16; *id.* Ex. D (Sanders Decl.) ¶ 8.

The Court finds that the injury alleged by the organizational plaintiffs is not palpable and is, at most, speculative. The plaintiffs' claims that they *may* have to expend or divert resources is simply too speculative to confer Article III standing. *See Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C.Cir.1994)(stating that the diversion of resources is a self-inflicted injury resulting from the organizations' own budgetary choices and insufficient to confer standing).

With respect to the organizational plaintiffs' argument that they will be deprived of clients, the government argues and the Court agrees, that there is no way to know whether aliens who are denied the opportunity to consult with counsel would have chosen to consult with the plaintiffs had they had the opportunity to do so. *See Diamond v. Charles*, 476 U.S. 54, 65–66, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)(denying doctor standing to defend the constitutionality of an Illinois abortion law because his alleged injury, loss

of business, was speculative). Moreover, the Court also agrees with the government that nothing in IIRIRA prevents the organizational plaintiffs from practicing their professions or fulfilling their missions. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 810 (D.C.Cir.1987)("[T]he interdiction program was not intended to prevent the interdicted Haitians from dealing with appellants. The interference with that relationship is an unintended side effect of a program with other purposes.")

Even if the Court found that the organizational plaintiffs had an injury sufficient to confer Article III standing, the Court finds that organizational plaintiffs do not meet the causation or redressability requirements. The causation requirement is intended to ensure that the challenged action was the cause of the alleged injury. *Center for Auto Safety*, 793 F.2d at 1334. The redressability test "*assumes* that a decision on the merits would be favorable and that the requested relief would be granted; it then goes on to ask whether the relief would be likely to redress the party's injury." *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C.Cir.1989)(emphasis in original). In this instance, granting the requested relief is not likely to redress the injury as the organizational plaintiffs cannot establish that, if, for example, additional information were provided to aliens, the aliens would turn to *plaintiffs'* particular organizations, as opposed to other organizations, friends, or even family, for assistance. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42–45, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (no causation or redressability); *Warth*, 422 U.S. at 507, 95 S.Ct. 2197 (no causation); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617–18, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (failure to show nexus between injury and government action).

Accordingly, the Court concludes that the organizational plaintiffs do not have standing in their own right to raise any claims, except for their First Amendment claim. Even the government concedes that the organizational plaintiffs have standing to raise their First Amendment claim. *See Wood* Defs.' Mot. at 21 n. 8 (citing *Ukrainian–American Bar Ass'n v. Baker*, 893 F.2d 1374, 1382 (D.C.Cir. 1990)).

### ii) Associational Standing

■ To satisfy the Article III requirements for associational standing, each organizational plaintiff must show that

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[12]

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *American Legal Found. v. FCC*, 808 F.2d at 84, 89 (D.C.Cir. 1987). In this case, the organizations' members cannot satisfy the standing requirements any more than can the organizational plaintiffs themselves.

■ The organizations allege that their members may suffer three types of injury: (1) diversion of limited resources to find other channels to communicate with refugees; (2) deprivation of clients; and (3) erroneous removal. Since the Court has already discussed and rejected the first two injuries with respect to whether the organizations have standing in their own right, only the alleged injury of erroneous removal will be addressed here.

Organizations are "obligated to allege facts sufficient to establish that one or more of [their] members has suffered, or is threatened with, an injury." *Valley Forge Christian College*, 454 U.S. at 487 n. 23, 102 S.Ct.

---

**12.** The threshold requirement for even applying this test is that the organization has actual members or indicia of membership. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Court, however, has serious doubts as to whether many of the organizational plaintiffs have members or indicia of membership. Indeed, in the *AILA* case, the plaintiffs seem to concede that only World Tamil and NCHR are membership organizations. *See AILA* Opp'n at 42–46. Nevertheless, because some of the organizations do indeed have members, the Court will go on to consider whether the organizational plaintiffs satisfy Article III standing requirements.

752; *see also McKinney v. United States Dep't of the Treasury*, 799 F.2d 1544, 1553 (Fed.Cir.1986) ("A certain degree of specificity in delineating the injury ... is a prerequisite to Article III standing."). This obligation extends to identifying the member or members of plaintiff organizations that have, or will suffer, harm. *See Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 54 n. 15 (D.C.Cir.1988)("[A] mere 'special interest' in a subject [does] not empower an organization to bring suit in federal court if it [can] identify no injured member."(citing *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); *Maine Ass'n of Interdependent Neighborhoods v. Commissioner, Maine Dep't of Human Servs.*, 747 F.Supp. 88, 92 (D.Me.1990) (allegation that "M.A.I.N. has members who are the head of a Food Stamp household but are not the primary wage earners" was insufficient to establish claim of associational standing where complaint "[did] not identify the member allegedly affected, nor [did] it identify any of the factual circumstances supporting her claim to be subject to the regulation"); *see also Valley Forge Christian College*, 454 U.S. at 487 n. 23, 102 S.Ct. 752 (holding that organization's claim that certain unidentified members suffered injury, standing alone, was not a "cognizable injury" sufficient to confer standing)).

Here, plaintiffs either generally allege harm to all members of all organizations or identify only vague categories of members that might suffer harm. They can point to no identifiable member or members for which the Court can evaluate the harm.[13]

Nowhere in their pleadings do the plaintiffs identify one injured person by name, allege that the injured person is a member of one of the plaintiff organizations (naming the specific organization), or allege facts suffi-

cient to establish the harm to that member. *See AILA* Am. Compl. ¶ 41 (stating broadly that "[m]embers of some of the Plaintiff organizations have sought and will continue to seek asylum in the United States"). Plaintiffs concede the factual insufficiency of their pleadings by admitting that "it will be impossible to identify individual refugees before they suffer irreparable harm." *Id.* at ¶ 1.

In addition, the injuries identified by plaintiffs with regard to their members being erroneously removed are, at most, only speculative. To establish injury in fact, organizational plaintiffs must show that their alien members (1) will seek entry into the United States; (2) with no documentation or with fraudulent documentation; and (3) will be found inadmissible and be removed from the United States. Plaintiffs themselves recognize that this chain of events is greatly attenuated. *See, e.g., AILA* Mot. for TRO, Ex. A (McCalla Decl.) ¶ 11 ("The manner in which the INS is interpreting the IIRIRA will have a detrimental effect on some of [NCHR's] Haitian members who, *in the future, might* be *bonafide* asylum seekers in the United States.") (emphasis added).

In *American–Arab Anti–Discrimination Comm. v. Thornburgh*, 970 F.2d 501 (9th Cir.1991) ("*AAADC*"), the AAADC brought a challenge to a statute that generally permitted the deportation of aliens who advocated or were members of a group that advocated communism. The court found that the organizational plaintiff lacked associational standing for precisely the reason that plaintiffs in this case lack standing—the harm was speculative, not actual. The court concluded that, to establish standing, "[a] plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's

---

**13.** Plaintiffs argue that in the "seminal case" of *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Supreme Court found associational standing and held that "the NAACP was constitutionally privileged to keep its members' identities' secret." *AILA* Opp'n at 45. However, the Court so held because it found that the members themselves were "constitutionally entitled to withhold their connection with the Association." 357 U.S. at 459, 78 S.Ct. 1163. If this right was not properly assertable by the Association, "[t]o require that it be claimed by the members themselves would result in nullification of the right at the very moment of its assertion." *Id.* Here, there is no such claim that the members are "constitutionally entitled" to withhold their connection to the organizational plaintiffs. Thus, *NAACP* does not persuade this Court to plaintiffs' view that it need not identify some injured member in order to have associational standing.

action." *Id.* at 510 (quoting *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

The court also noted that while "American–Arab's allegations sufficiently give them a 'special interest' in the outcome of the present case; ... this does not provide standing." *Id.* (citing *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient" to confer standing.)). Because the organizational plaintiffs cannot demonstrate that they have members who possess standing, the organizational plaintiffs do not have associational standing. Therefore, the Court concludes that the organizational plaintiffs lack standing to raise all of their claims, except for their First Amendment claim.

## IV. SUBSTANTIVE CLAIMS

The government has moved to dismiss all counts in the complaints for failure to state a claim upon which relief can be granted. In considering a motion under Rule 12(b)(6), the Court must accept plaintiffs' factual allegations as true, *see Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and draw all inferences in plaintiffs' favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). To prevail on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the government must show "beyond doubt that the plaintiff can prove no set of facts in support of [plaintiffs'] claim which would entitle [them] to

relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Moreover, the Court finds that the entire case on review involves only questions of law and does not turn on issues of fact. Therefore, "because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage." *Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C.Cir.1993).

The Court will first address the claims of the individual plaintiffs, Ms. Perez and Ms. Aquino de Pacheco, and the government's arguments for dismissing those claims. The Court will address the individual plaintiffs' claims in the following order: first, plaintiffs' claim that the Interim Regulations violate IIRIRA; second, plaintiffs' claim that the agency fails to follow its own regulations; third, plaintiffs' claim that IIRIRA and the Interim Regulations violate due process; and finally, the plaintiffs' claim that implementation of IIRIRA violates equal protection under the Fifth Amendment.[14] Finally, the Court will address the organizational plaintiffs' claim that IIRIRA and the Interim Regulations violate their First Amendment rights.

### A. Claim That Interim Regulations Violate IIRIRA

For their first claim, plaintiffs' underlying theory is that, by enacting IIRIRA, Congress intended to establish fair procedures to protect individuals entitled to enter the United States.[15] Plaintiffs thus argue that the Attorney General's Interim Regulations, policies, and procedures for summary removal violate Congress's intent by providing insuffi-

---

**14.** Plaintiffs additionally asserted that IIRIRA violated International Law on refugees and juveniles. However, because the Court has found that none of the organizational or individual plaintiffs have standing to assert the International Law claim, the Court does not discuss that claim.

**15.** At the hearing on the government's motion, plaintiffs argued that this Court could not make a decision on whether the Interim Regulations are reasonable without reviewing the administrative record leading to the Interim Regulations. As the government correctly notes, however, plain-

tiffs have stated they are not challenging "the rulemaking *process,* but the *effects* of that rulemaking in light of express Congressional intent." *AILA/Liberians* Opp'n at 43. The plaintiffs expressly state they are not bringing a claim under the APA to attack the process through which the regulations came about, *id.;* rather plaintiffs claim that the regulations are unreasonable and in violation of Congress's intent because they do not provide individuals with sufficient information and because the regulations provide inadequate procedures.

cient protections, therefore creating an "unreasonably high risk" that individuals will be erroneously removed.

The government counters plaintiffs' argument that Congress intended for fair procedures by emphasizing that whether the procedures set out by the regulations are "fair" is within the *agency's* determination under IIRIRA § 309(b) because Congress delegated to the Attorney General the task of establishing procedures. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *American Fed'n of Labor v. Donovan,* 757 F.2d 330, 341 (D.C.Cir.1985); *Natural Resources Defense Council v. NRC,* 666 F.2d 595, 603 (D.C.Cir.1981).

In reviewing an agency's interpretation of a statute it is charged with administering, the *Court* must be guided by the framework of *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See also Halverson v. Slater,* 129 F.3d 180, 184 (D.C.Cir. 1997). Under the familiar *Chevron* two-step test, the first step is to ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778; *see Halverson,* 129 F.3d at 184. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *see Halverson,* 129 F.3d at 184.

■ Furthermore, where, as here, Congress has expressly instructed an agency to promulgate regulations carrying out general statutory mandates, *see* IIRIRA § 309(b), a reviewing court's inquiry is limited to whether the agency's actions in promulgating the regulations were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 41, 103 S.Ct. 2856. "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* at 43, 103 S.Ct. 2856.

■ Finally, an agency is entitled to the highest degree of deference where Congress has delegated to the agency the authority "to promulgate standards or classifications." *American Fed'n of Labor v. Donovan,* 757 F.2d 330, 341 (D.C.Cir.1985). Such standards or classifications are entitled to "legislative effect" and are to be given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.; Natural Resources Defense Council,* 666 F.2d at 603–04 (finding that this "venerable principle" that the construction of a statute by those charged with its execution should be followed unless there are "compelling indications that it is wrong," has even "greater force when Congress has specifically left it to the agency to flesh out the terms of the statute").

Specifically, plaintiffs attack several policies, practices and procedures under the Interim Regulations, "including but not limited to" the following: 1) the ban on aliens' communicating with family, friends and counsel during secondary inspection; 2) the failure to provide adequate language interpretation at secondary inspection; 3) the failure to provide adequate access to and participation of counsel prior to and during the secondary inspection; 4) the failure to provide adequate information on charges and procedures, the opportunity to contest those charges, and the failure to provide for review of removal orders; and 5) the application of these procedures to individuals with facially valid documents.

**1. Ban on Aliens' Communication with Family and Friends During Secondary Inspection Violates the Provisions of IIRIRA**

■ In this claim, plaintiffs seek to extend an alien's opportunity to consult with others prior to and during secondary inspection. Plaintiffs argue that consultation prior to and during secondary inspection is important because an arriving alien is often not familiar with English or with INS procedures.

Under IIRIRA, "[a]n alien who is eligible for [the credible fear] interview may consult with a person or persons of the alien's choosing *prior to* the interview or any review thereof, according to regulations prescribed by the Attorney General." INA § 235(b)(1)(B)(iv) (emphasis added). The regulations interpret this section to permit an alien to consult with family and friends in the time *between* secondary inspection and the credible fear interview. *See* 8 C.F.R. § 235.3(b)(4)(i).

Plaintiffs, however, argue that Congress, by providing that the alien "may consult" with others, clearly recognized the importance of consultation during the process. Plaintiffs thus argue that the Attorney General's regulations limiting an alien's access to others only to consultation after secondary inspection, but prior to the credible fear interview, violates Congress's intent to allow an alien to consult with others. Plaintiffs contend that aliens should be allowed to consult during secondary inspection because of the importance of being able to express a fear of persecution at that time in order to be referred to a credible fear interview.

Second, plaintiffs argue that because the sentence immediately before the consultation provision states that "[t]he Attorney General shall provide information concerning the asylum interview to aliens who *may be eligible,*" INA § 235(b)(1)(B)(iv) (emphasis added), Congress also intended to allow aliens who "may be eligible" to consult with others prior to and during secondary inspection.

In seeking to dismiss plaintiffs' claim that the regulations violate the statute by not allowing consultation prior to or during secondary inspection, the government argues that plaintiffs' interpretation of the statute is in conflict with both the plain language of the statute and the intent of Congress to create an expeditious process.

In response to plaintiffs' argument that all aliens who "may be" eligible for an interview should be allowed to consult with others, the government counters that, under the statute, the Attorney General shall provide information to aliens who "may be" eligible, but then provides an opportunity for consultation only to an alien who "is" eligible. Under the statute, an alien is only eligible for a credible fear interview after "indicat[ing] either an intention to apply for asylum under § 208 or a fear of persecution." INA § 235(b)(1)(A)(ii). The government thus argues that, under the statute, the only individuals to be allowed an opportunity to consult with others are those who indicate a fear of persecution during secondary inspection and are thus referred for a credible fear interview.

Second, the government points to legislative history to support its position that, in order to prevent false claims, Congress specifically did not want aliens to have the opportunity to consult with others prior to making a claim for asylum. *See* 142 Cong. Rec. H2358 (daily ed. Mar. 19, 1996) ("There should be a summary or expedited exclusion process to deal with these people, especially those who do not make a credible claim of asylum when they first set foot off the plane." (statement of Rep. McCollum)).

The Court concludes that Congress has not "spoken directly" to this precise question. However, the Court further finds that in view of the language of the statute and the intent of Congress, the Attorney General could reasonably have determined that the statutory language allowing consultation "prior to the [credible fear] interview" be interpreted to mean consultation during the period between secondary inspection and the credible fear interview and not be interpreted to include consultation at an earlier stage, i.e. prior to and during secondary inspection. Thus, the Court concludes that the Attorney General reasonably concluded that allowing consultation in the time between an alien's secondary inspection and credible fear interview would advance Congress's twin goals of creating a fair yet expedited process. *See* 62 Fed.Reg. at 10319 ("As for delaying the secondary interview to allow every alien time to rest prior to being questioned, the [INS] again points out that it conducts more than ten million secondary inspections a year. Most of those questioned are eager to have their inspection completed as quickly as possible. The Department has neither the resources nor the authority to detain all secondary referrals without first conducting a

prompt interview to determine admissibility.") [16]

### 2. The System Fails to Provide Adequate Language Interpretation at Secondary Inspection

 As a general proposition, plaintiffs contend that competent translation services are required for a procedurally fair system. *See Augustin v. Sava,* 735 F.2d 32, 33 (2d Cir.1984). Although IIRIRA does not mention the need for interpreters, the Interim Regulations nevertheless provide for interpreters during secondary inspection. *See* 8 C.F.R. § 235.3(b)(2)(i), 62 Fed.Reg. 10356 ("Interpretive assistance shall be used if necessary to communicate with the alien."). The government argues that because the regulations provide additional procedural protections not required or mentioned in IIRIRA, then the regulations cannot violate IIRIRA or be considered arbitrary and capricious. *See El Rescate Legal Servs. v. EOIR,* 959 F.2d 742, 751 (9th Cir.1991) (holding that translation not required in deportation hearings under predecessor statute).

Plaintiffs are correct that a system that provides information that the recipient does not understand cannot be considered to be providing adequate notice. The problem with plaintiffs' argument with respect to the regulations at issue is that the regulations fill in a gap left by the statute and address the translation issue. Plaintiffs' grievance thus is not with the statute or the regulations, but with plaintiffs' perception that the regulations are not being followed or the translators used are incompetent. These issues go to plaintiffs' attack on the regulations not as written, but as applied—an issue the Court will address.

On plaintiffs' challenge to the regulations as written, however, the Court finds that because the statute is silent on the issue of providing for interpretive assistance to aliens, the Court must next ask whether the regulations are based on a permissible interpretation of the statute. Since Congress instructed the agency to promulgate regula-

tions carrying out the general statutory scheme, deference is owed to the agency's interpretation of the statute. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 41, 103 S.Ct. 2856. The Court further finds that the regulations withstand review on an arbitrary and capricious standard because the regulations provide more procedural protections than the statute itself.

### 3. System Fails to Provide Adequate Access to and Participation of Counsel During Secondary Inspection

 Plaintiffs claim that the Attorney General's Interim Regulations and the agency's policies contradict Congress's intent to provide fair procedures in the expedited removal system by denying aliens access to counsel at the secondary inspection stage.

As with plaintiffs' claim regarding consultation with family and friends (see Section IV.A.1 above), the Attorney General could reasonably decide to limit an alien's opportunity for consultation with counsel to the time between secondary inspection and a credible fear interview. Because the statutory language is ambiguous in that it provides for consultation "prior to" the credible fear interview, but does not define the contours of that time period, the Court concludes that the Attorney General's decision to ban an aliens' access to counsel during the secondary inspection stage is reasonable in view of Congress's dual purposes in providing fair procedures while creating a more expedited removal process.

### 4. The Failure to Provide Adequate Information on Charges and Procedures, the Opportunity to Contest Those Charges, and Review

 Plaintiffs claim that aliens in expedited removal proceedings do not receive "adequate information on charges and procedures," *Wood* Am. Compl. ¶ 75, "an opportunity to contest those charges," *id.,* or "any meaningful review of removal orders." *Id.* Indeed, IIRIRA's expedited removal provi-

---

**16.** "[A]s matters of public record, statements in the Federal Register can be examined on 12(b)(6) review." *Marshall County Health Care Auth. v.*

*Shalala,* 988 F.2d 1221, 1226 n. 6 (D.C.Cir. 1993).

sions do not set forth any requirement of notice, opportunity for rebuttal, or review. The statute merely provides that if an immigration officer finds that an arriving alien is inadmissible because she either has fraudulent documentation or no valid documentation and is not claiming "status" or a fear of persecution, "the officer shall order the alien removed from the United States . . . ." INA § 235(b)(1)(A)(i). Indeed, IIRIRA explicitly states that such removal shall occur *"without further hearing or review . . . ." Id.* (emphasis added). The Attorney General's Interim Regulations and other written directives fully comport with this bare statutory language.

Moreover, assuming that IIRIRA implicitly does require some notice and opportunity for rebuttal, the Attorney General's writings are in full compliance. Because IIRIRA is silent as to the nature of any required notice and rebuttal opportunity, the Court must defer to the Attorney General's determination as to what procedures are appropriate, so long as that determination is reasonable. *See Chevron, U.S.A.,* 467 U.S. at 842–43, 104 S.Ct. 2778; *Halverson,* 129 F.3d at 184. Here, the Attorney General's determination was eminently reasonable, in that her writings specifically require that aliens be advised of the inadmissibility charges against them and be given an opportunity to respond. Plaintiffs cannot impose upon the Attorney General any obligation to afford more procedures than the governing statute explicitly requires or that she has chosen to afford in her discretion. *See Vermont Yankee Nuclear Power Corp. v. Nat. Resources Defense Council,* 435 U.S. 519, 524–25, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

While Ms. Perez and Ms. Aquino de Pacheco claim that they were not informed of the basis of their inadmissibility, the Court cannot consider this argument. Again, plaintiffs' argument goes to the regulations not as written, but as specifically applied.

### 5. Application to Individuals with Facially Valid Visas

 Plaintiffs contend that IIRIRA's expedited removal procedures should apply only to aliens whose travel documentation is "facially" invalid, and that defendants are violating the statute by also placing in expedited removal proceedings those aliens found inadmissible under INA § 212(a)(6)(C) or (a)(7) based on factors other than the face of a travel document itself. According to plaintiffs, "Congress intended that any other arriving alien that an immigration officer determines to be inadmissible (for example, based on a belief that the alien intends to remain permanently or otherwise violate the terms of her visa) be referred for a full hearing before an Immigration Judge under the regular removal process of INA § 240." *Wood* Am. Compl. ¶¶ 34, 52. Plaintiffs also claim that "[t]he INS has implemented § 235 by placing in expedited removal persons suspected of having the wrong type of visa or an intent inconsistent with their visa category." *Wood* Opp'n at 9. The plain language of IIRIRA conclusively refutes plaintiffs' contention.

IIRIRA states that expedited removal procedures shall apply whenever "an [inspecting] immigration officer determines that an [arriving] alien . . . is inadmissible under [INA] section 212(a)(6)(C) or 212(a)(7)." *See* INA § 235(b)(1)(A)(i). The plaintiffs' own brief quotes the language of section 212(a)(6)(C): "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure . . . or has procured a visa, documentation, or admission into the United States or other benefit provided under this Act is inadmissible." *Wood* Opp'n at 6. Inadmissibility under INA § 212(a)(6)(C) or (a)(7) plainly can arise for reasons other than "facially" bad or absent papers. The plain language of this section refutes plaintiffs' argument that inspecting immigration officers are restricted determinations of the "facial" validity of documents.

Moreover, the D.C. Circuit has affirmed findings of inadmissibility under the predecessors to IIRIRA based on an alien's fraudulent subjective intentions, despite the lack of any indication of invalidity on the face of a document. *See Castaneda–Gonzalez v. INS,* 564 F.2d 417, 424 n. 14, 425 (D.C.Cir.1977). There, the circuit found that even where an alien possessed a labor certificate duly issued by the Secretary of Labor, the Attorney General could still exclude the alien under

INA § 212(a)(6)(C)'s predecessor, for having obtained the certificate on the basis of a material and willful misrepresentation. *Id.; see also Witter v. INS*, 113 F.3d 549, 554 (5th Cir.1997) (affirming finding of excludability under predecessor to INA § 212(a)(6)(C) where substantial evidence indicated that aliens did not have "a good faith belief that they were married" when they applied for immigrant visas); *Garcia v. INS*, 31 F.3d 441, 443 (7th Cir.1994) (affirming finding of excludability under § 212(a)(6)(C)'s predecessor, court focused on alien's "subjective" state of mind in representing that she was unmarried in order to procure visa, notwithstanding subsequent retroactive annulment of marriage); *Kalejs v. INS*, 10 F.3d 441, 445–46 (7th Cir.1993) (holding that alien with facially valid visa was inadmissible under § 212(a)(6)(C) because he had lied on his visa application about his activities in a pre-Nazi military unit during World War II), *cert. denied*, 510 U.S. 1196, 114 S.Ct. 1305, 127 L.Ed.2d 656 (1994); *Madany v. Smith*, 696 F.2d 1008, 1012 (D.C.Cir.1983) (same import as *Castaneda–Gonzalez*, 564 F.2d 417).

A consular officer's issuance of a visa does not by itself authorize an alien to enter the United States. It "does no more than entitle [the] alien to present himself at a port of entry to prove his admissibility before the [INS]." *Castaneda–Gonzalez*, 564 F.2d at 426; *see also* INA § 221(a),(e),(g),(h), 8 U.S.C. § 1201(a),(e),(g),(h); 8 C.F.R. § 235.1(d)(1). The INA has long provided that:

> *Nothing in this Act shall be construed to entitle any alien,* to whom a visa or other documentation has been issued, *to be admitted* to the United States, if, upon arrival at a port of entry in the United States, he is found inadmissible under this Act, or any provision of law. The substance of this subsection shall appear upon every visa application.

INA § 221(h) (emphasis added); *see also Castaneda–Gonzalez*, 564 F.2d at 427 ("Congress apparently has decided that [the 'double-check' system's] benefits outweigh its costs, and has continued the statutory framework which requires consular officers and

the Attorney General independently to address the same issues in different contexts.").

Thus, an inspecting officer can and must refuse admission if a visa holder fails to establish to the inspector's own satisfaction that the visa holder fulfills the requirements for the classification which his visa bears. Contrary to plaintiffs' apparent belief, the inspector is not statutorily limited to ascertaining that the "face" of the visa indicates that a consular officer has found the alien admissible; rather, the inspector undertakes an independent admissibility determination himself. Plaintiffs' claim regarding "facially valid" visas is devoid of merit.

## B. Claim that Agency Fails to Follow Regulations

■ With respect to plaintiffs' "as applied" challenge, plaintiffs allege that INS is failing to follow the Interim Regulations. Plaintiffs support their allegations with examples of the experiences faced by the individual named plaintiffs. Even though the regulations state that individuals should be allowed adequate food, water, and restroom access, plaintiffs Perez and Aquino de Pacheco allege that they were detained without food, water, or access to restroom facilities, and held for extended periods of time. *See Wood* Am. Compl. ¶¶ 58–59. In the case of Ms. Perez, a 70–year–old woman, plaintiffs allege she was detained by INS for approximately nineteen hours. *See id.* ¶ 58. Further, plaintiffs claim that both Ms. Perez and Ms. Aquino de Pacheco were told to sign a document that was neither explained nor translated into Spanish. *See id.* ¶¶ 58–59.

The government argues that the plaintiffs are not seeking to challenge the Interim Regulations as violating IIRIRA but rather seek to challenge unwritten policies and practices. Under IIRIRA, however, the government argues that plaintiffs cannot challenge the agency's failure to follow the Attorney General's Interim Regulations because the statute expressly limits systemic challenges to

> determinations of whether such a regulation, *written* policy directive, *written* policy guideline, or *written* procedure issued by or under the authority of the Attorney

General ... is not consistent with applicable provisions of this title or is otherwise in violation of law.

§ 242(e)(3)(A)(ii)(emphasis added). The government argues, therefore, that under the provisions of the statute, the agency's failure to follow its own regulations is not actionable.

First, to sidestep IIRIRA's restrictions on judicial review under § 242(e)(3)(A)(ii), plaintiffs argue that the policies and procedures that have resulted from the regulations should be reviewed together with the regulations. Second, to the extent they challenge unwritten practices, which § 242(e)(3)(A)(ii) does not allow, plaintiffs argue that Congress cannot limit review of unwritten policies because this would mean that possibly unconstitutional action by immigration officials would not be reviewable by a court—a result that Congress could not have intended. Plaintiffs also argue that even if the Court finds that plaintiffs' claims are not reviewable under INA § 242(e)(3), the Court would still have federal question jurisdiction under 28 U.S.C. § 1331 over many of these claims.

The Court concludes that, based on the clear language of the jurisdictional provision of § 242(e)(3)(A)(ii), this Court cannot review unwritten policies or practices but rather must limit its review to a "regulation, a written policy directive, written policy guideline, or written procedure." INA § 242(e)(3)(A)(ii); *see also Hadera v. INS*, 136 F.3d 1338, 1340 (D.C.Cir.1998) (denying alien's appeal of Board of Immigration Appeals decision partly on the basis of the jurisdictional provision in IIRIRA § 309(c)(4)(C)).

The Court is, nevertheless, troubled by the effects of Congress's decision to immunize the unwritten actions of an agency from judicial review, particularly where, as here, so much discretion is placed in the hands of individual INS agents who face only a supervisor's review of their decisions. In their complaints, plaintiffs have alleged serious failures by the INS to follow its own regulations in the treatment of aliens arriving in the United States. Therefore, the Court, in the strongest language possible, admonishes the Immigration and Naturalization Service to comply with its own regulations, policies, and procedures in providing aliens with the treatment, facilities, and information required by the agency's regulations, policies, and procedures.

## C. Due Process Claim

■■■ Plaintiffs claim that under IIRIRA individuals will be erroneously removed from the United States and thus deprived of liberty and property. Specifically, plaintiffs complain that individuals are deprived of their due process rights through the enforcement of IIRIRA and the implementation of the above discussed procedures, including prohibitions on access to family, counsel, and interpreters. Plaintiffs complain that this system "creates an unreasonably high danger that [those] entitled to enter the United States ... will be erroneously removed." *AILA* Am. Compl. ¶ 68; *see Wood* Am. Compl. ¶ 79. As a preliminary matter, the Court must first determine what, if any, due process rights the complaining individuals, Ms. Perez and Ms. Aquino de Pacheco, possess.

The government urges dismissal of this claim because "aliens seeking initial admission to the United States have no constitutional rights with respect to their immigration status." *AILA* Defs.' Mot. at 55. Moreover, the Supreme Court has repeatedly stated that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (citation omitted). Indeed, "the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the Government's political departments, largely immune from judicial control." *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). Thus, the Supreme Court recognized almost fifty years ago that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950).

It is also firmly established that "[al]though aliens seeking admission into the

United States may physically be allowed within its borders pending a determination of admissibility; such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Gisbert v. United States Att'y Gen.*, 988 F.2d 1437, 1440 (5th Cir.1993), *amended by* 997 F.2d 1122, 1123 (5th Cir.1993); *see also Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 175, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *Ukrainian–American Bar Ass'n v. Baker*, 893 F.2d 1374, 1382 (D.C.Cir.1990). Because such aliens are not considered to be within the United States, but rather at the border, courts have long recognized that such aliens have "no constitutional right[s]" with respect to their applications for admission. *See Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (citing *Knauff*, 338 U.S. at 542, 70 S.Ct. 309); *see also Kleindienst v. Mandel*, 408 U.S. 753, 761, 766, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Correa v. Thornburgh*, 901 F.2d 1166, 1171 n. 5 (2d Cir.1990) (noting that apart from "protections against gross physical abuse," aliens seeking initial admission are entitled to no constitutional due process protection); *Ukrainian–American*, 893 F.2d at 1382; *Rafeedie v. INS*, 880 F.2d 506, 520 (1989).

> Indeed, this Circuit has held that
>
> an initial entrant has no liberty (or other) interest in entering the United States, and thus has no constitutional right to *any* process in that context; whatever Congress by statute provides is obviously sufficient, so far as the Constitution goes.
>
> Our starting point, therefore, is that an applicant for initial entry has no constitutionally cognizable liberty interest in being permitted to enter the United States.

*Rafeedie*, 880 F.2d at 520 (emphasis in original).

This circuit has also addressed the similar issue of whether the government was required to give aliens seeking asylum in the United States notice of a bar association's offer to provide free legal services. *See Ukrainian–American*, 893 F.2d at 1382. The court there noted that " 'an alien seeking initial admission to the United States requests a privilege and has *no constitutional*

*rights* regarding his application.' " *Id.* (quoting *Landon*, 459 U.S. at 32, 103 S.Ct. 321 (emphasis added); *see also Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir.1996) (holding that inadmissible "asylum applicants do not have constitutional due process protections," but only those procedural rights granted by Congress); *Jean v. Nelson*, 727 F.2d 957, 981–82, 984 (11th Cir.1984) (en banc) (holding that inadmissible Haitians had "no constitutional rights with respect to their applications for admission, asylum, or parole."), *aff'd on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)).

Plaintiffs argue that defendants mischaracterize the law of this circuit. Plaintiffs assert that "a returning permanent resident 'has a liberty interest in being permitted to reenter this country and is therefore entitled to due process before [she] can be denied admission.' " *Wood* Opp'n at 37 (quoting *Rafeedie*, 880 F.2d at 520)(emphasis added). Plaintiffs further argue that "aliens with community ties to the U.S. may enjoy liberty interests cognizable under the Due Process Clause." *Wood* Opp'n at 38 (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)("[A]liens receive constitutional protections when they have come within the territory of the United states and developed substantial connections with this country."); *Johnson v. Eisentrager*, 339 U.S. 763, 770, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)("[T]he alien ... has been accorded a generous and ascending scale of rights as he increases his identity with our society."); *Haitian Ctrs. Council, Inc. v. Sale*, 823 F.Supp. 1028, 1042 (E.D.N.Y.1993)("As [aliens'] ties to the United States have grown, so have their due process rights.")).

While plaintiffs accurately cite the foregoing cases, those cases are inapposite here. Plaintiffs rely on cases which suggest that permanent residents or those with "substantial connections" to the United States may be entitled to constitutional protections. Here, however, Ms. Perez and Ms. Aquino de Pacheco are not lawful permanent residents. Moreover, there is no indication that either has developed "substantial connections" with

the United States.[17]

The Court finds that the cases cited by plaintiffs do not establish that Ms. Perez and Ms. Aquino de Pacheco have due process rights with respect to their admission into the United States. To the contrary, the cases cited by defendant are representative of the overwhelming case law, including that of this circuit, holding that initial entrants have no due process rights with respect to their admission. *See, e.g., Landon,* 459 U.S. at 32, 103 S.Ct. 321; *Knauff,* 338 U.S. at 544, 70 S.Ct. 309; *Ukrainian–American,* 893 F.2d at 1382; *Rafeedie,* 880 F.2d at 520. Thus, in view of long-standing precedent holding that aliens have no due process rights, the Court concludes that the alien plaintiffs here cannot avail themselves of the protections of the Fifth Amendment to guarantee certain procedures with respect to their admission. Therefore, plaintiffs' due process claim must also be dismissed.

**D. Equal Protection Claim**

 The *Wood* complaint raises a Fifth Amendment equal protection claim for discrimination, alleging that "[i]ndividuals who are considered suspect by INS inspecting officers because of race, color, gender, accent, and ethnic origin have been and will continue to be subject to illegal procedures and practices of the INS." *Wood* Am. Compl. ¶ 83. Plaintiffs Perez and Aquino de Pacheco assert that the "implementation of IIRIRA is subject to equal protection scrutiny, even as applied to arriving aliens." *Wood* Opp'n at 49.

The government seeks to dismiss plaintiffs' equal protection claim on the basis that plaintiffs have not demonstrated a *prima facie*

case of discrimination on any basis as plaintiffs have not identified any individual plaintiff allegedly singled out for expedited removal because of race, color, gender, accent, or ethnic origin. In their opposition to defendants' motion to dismiss, plaintiffs assert that because they state this claim through the organizations, "it is not fatal that no *individual named plaintiff* presents a claim that the removal order in her particular claim resulted from discrimination." *Wood* Opp'n at 49.

Because the Court has concluded that the organizational plaintiffs only have standing to raise their First Amendment claim, and because plaintiffs put forth no facts on which to base a Fifth Amendment equal protection claim as to plaintiffs Perez and Aquino de Pacheco, the Court concludes that plaintiffs fail to state a claim upon which relief may be granted. Therefore, plaintiffs' Fifth Amendment equal protection claim must be dismissed.

**E. First Amendment Claim**

 Plaintiffs next claim that defendants have violated plaintiffs' rights under the First Amendment to the United States Constitution by refusing to allow plaintiffs access to the secondary inspection process, and by otherwise impeding plaintiffs' access to persons subject to expedited removal procedures. *AILA/Liberians* Am. Compl. ¶ 96; *Wood* Am. Compl. ¶¶ 86–88. The government concedes that the organizational plaintiffs have standing to bring this claim. *See Wood* Defs.' Mot. at 21 n. 8.

The D.C. Circuit has squarely addressed this issue. *See Ukrainian–American,* 893 F.2d 1374 (D.C.Cir.1990).[18] The decision in

---

**17.** Although the complaint alleges that Ms. Perez "regularly comes to the United States to visit her [ill] daughter and grandchild," *Wood* Am. Compl. ¶ 58, this does not rise to the level of a substantial connection. *Cf. Haitian Ctrs. Council,* 823 F.Supp. at 1042 (holding that two-year confinement at Guantanamo established substantial connection to the United States to give rise to due process rights).

**18.** Other courts that have considered this issue have also declined to recognize a First Amendment right of access to aliens detained by the government. In *Haitian Refugee Ctr., Inc. v. Bak-*

*er,* 953 F.2d 1498 (11th Cir.) (per curiam), *cert. denied,* 502 U.S. 1122, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992), the Eleventh Circuit found that even if the plaintiff organization had some limited right to associate with interdicted and detained Haitians, this did not give rise to a right of *government*-provided access. *Id.* at 1513. Citing *Ukrainian–American,* the court held that the Constitution does not require the government to assist the holder of a constitutional right in the exercise of that right. *Haitian Refugee Ctr., Inc.,* 953 F.2d at 1513; *see also Cuban American Bar Ass'n, Inc. v. Christopher,* 43 F.3d 1412, 1429 (11th Cir.) (holding that attorneys did not have

*Ukrainian–American* stemmed from an attempt by a Ukrainian merchant seaman, who jumped ship, to obtain political asylum in the United States. Attorneys who learned of the incident offered to assist the seaman in seeking asylum, but the government rejected their offers. *Id.* at 1376. The individual attorneys and the Ukrainian–American Bar Association ("UABA") then brought suit, alleging denial of their First Amendment rights of access to the seaman and others like him for the purpose of counseling such individuals regarding their ability to apply for political asylum. *Id.* at 1376–77. The district court ordered the INS to forward plaintiffs' offer of assistance to each person from a Soviet or East bloc country who sought asylum, but did not require the government to notify UABA every time a Ukrainian sought asylum, or to provide access without the alien's specifically having requested legal assistance. *Id.* at 1377. On appeal by the government, the Court of Appeals reversed the district court's grant of relief. *Id.* at 1382.

The D.C. Circuit explicitly considered and rejected the *Ukrainian–American* plaintiffs' argument that the government, once having acted to place an alien in custody, violates the First Amendment rights of third parties, such as the organizational plaintiffs here, when it declines to make arrangements for the third parties to contact the alien. *Id.* at 1381. The court held:

> [W]hen an unadmitted alien is taken into custody for interrogation and "immediate action," his entrance into custody does not infringe the right of any third party— whether a lawyer or another with an interest in getting a message through to the alien—to engage in constitutionally protected political expression.
>
> . . . . .
>
> Furthermore, the Government does not infringe a third party's first amendment right to associate with an alien by holding the alien for a period of time during which the third party is unable to contact him. The loss of the right of association while the alien is held incommunicado by the Government is not of constitutional significance; it is but an indirect consequence of the Government's pursuit of an important task.
>
> *Id.*

Finally, the circuit likened the UABA's First Amendment "access" claim to a claim that the government's interview of a potential defector constitutes a public forum wherein all persons have a right to express their views. *Id.* at 1381. The circuit rejected any such claim, finding that the government's exclusion of private citizens from INS interviews, so long as it is not selective and not based upon the content of views, does not violate the public forum doctrine. *Id.* In reaching this conclusion, the circuit noted that if there were a right to speak in such a forum, "the Government might find it very difficult to get on with the business of governing" and would suffer a "substantial burden." *Id.* "The multiplicity of requests for access to a single alien or to different categories of aliens would divert the Government from its priority of resolving the issue requiring 'immediate action.'" *Id.* at 1382.

Plaintiffs attempt to avoid the on-point holding of this circuit by distinguishing *Ukrainian–American,* arguing that *Ukrainian–American* upheld a restriction on speech if it is "not selective and not based upon the content of the views presented." *Id.* at 1381. Plaintiffs argue that in *Ukrainian–American,* "the restriction was not viewpoint or content-based because the Government was denying access to all potentially interested parties." *See Wood* Opp'n at 50 (citing *Ukrainian–American,* 893 F.2d at 1382). While in this case, plaintiffs suggest that the government is denying access based on content.

There are several problems with plaintiffs' argument. First, plaintiffs never asserted in their complaint that the restrictions on their access to entrants into the United States are content-based. *See AILA/Liberians* Am. Compl. ¶¶ 108–10; *Wood* Am. Compl. ¶¶ 86–

First Amendment right of access to interdicted migrants), *cert. denied,* 516 U.S. 913, 116 S.Ct.

299, 133 L.Ed.2d 205 (1995).

**62**

88. Second, the Court finds that the restriction here, like that in *Ukrainian–American,* is not content-based because the government denies access to all organizations.

Given the D.C. Circuit's holding in *Ukrainian–American* that legal assistance organizations do not have a First Amendment right to government-provided access to aliens in removal proceedings, the organizational plaintiffs' First Amendment claim is devoid of merit and must therefore be dismissed.

### F. Declaratory Judgment

Plaintiffs' final claim for relief, a request for a declaratory judgment, raises no additional substantive allegations but only requests the entry of declaratory relief. Given that plaintiffs are not entitled to any relief on their substantive claims because they fail to state a claim under Rule 12(b)(6), it follows that their final claim requesting a declaratory judgment is dismissed as well.

### V. CONCLUSION

*Accordingly, it is hereby*

**ORDERED** that defendants' motions to dismiss the complaints in these consolidated cases are **GRANTED;** and it is further

**ORDERED** that these cases are **DISMISSED WITH PREJUDICE;** and it is further

**ORDERED** that the Clerk shall enter final judgment in favor of defendants and against all named plaintiffs.