United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 17, 1999 Decided January 11, 2000 

 No. 98-5463

 American Immigration Lawyers Association, et al., 
 Appellants

 v.

 Janet Reno, Attorney General 
 of the United States, et al., 
 Appellees

 Consolidated with 
 Nos. 98-5464 & 98-5466

 Appeals from the United States District Court 
 for the District of Columbia 
 (97cv00597) 
 (97cv01229) 
 (97cv01237) 

 ---------

 J.J. Gass argued the cause for appellants. With him on the 
briefs were Judy Rabinovitz, Roderic V.O. Boggs, Robert 
Rubin, Robert E. Juceam, David I. Gelfand, and Karen T. 
Grisez. Adelia S. Borrasca and Jerome G. Snider entered 
appearances.

 Nancy L. Perkins was on the brief for amicus curiae The 
Lawyers Committee for Human Rights.

 Michele E. Beasley was on the brief for amicus curiae 
Women's Commission for Refugee Women and Children.

 Linda S. Wendtland, Attorney, U.S. Department of Justice, 
argued the cause for appellees. With her on the briefs were 
David W. Ogden, Acting Assistant Attorney General, Donald 
E. Keener, David J. Kline, Ellen Sue Shapiro, and Teresa A. 
Wallbaum, Attorneys.

 Before: Ginsburg, Henderson, and Randolph, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: The Illegal Immigration Reform 
and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. 
L. No. 104-208, 110 Stat. 3009, established a system for 
expediting the removal of aliens who arrive at the border but 
are not eligible for admission. Congress permitted judicial 
review of the new system, but set a deadline: all actions had 
to be "filed no later than 60 days after the date the chal-
lenged section, regulation, directive, guidance, or procedure 
... is first implemented."1 8 U.S.C. s 1252(e)(3)(A)-(B). 
Ten organizations and twenty aliens, some added after the 
deadline expired, brought constitutional, statutory, and inter-
national law challenges after the Attorney General issued 

__________
 1 8 U.S.C. s 1252 provides the exclusive jurisdictional basis for 
challenging the removal procedures: "Except as provided in this 
section and notwithstanding any other provision of law, no court 
shall have jurisdiction to hear any cause or claim by or on behalf of 
any alien arising from the decision or action by the Attorney 
General to commence proceedings, adjudicate cases, or execute 
removal orders against any alien under this Act." 8 U.S.C. 
s 1252(g).

regulations under the new law. The district court disposed of 
the cases mainly on jurisdictional grounds, although it did 
reject the claims of two of the alien plaintiffs on the merits. 
See American Immigration Lawyers Ass'n v. Reno, 18 
F. Supp. 2d 38 (D.D.C. 1998). We hold that the organization-
al plaintiffs lacked standing to litigate the rights of aliens not 
parties to the lawsuits and that the judgment of the district 
court should be affirmed in all other respects.

 I

 A

 Every person who arrives at a United States port of entry 
undergoes primary inspection during which immigration offi-
cers review the individual's documents. In fiscal year 1996, 
the Immigration and Naturalization Service conducted 475 
million primary inspections. 62 Fed. Reg. 10,312, 10,318 
(1997). Returning citizens produce their passports; aliens 
must show a valid visa or other entry document. If the 
immigration officer is unable to verify an alien's admissibility, 
the alien is referred to secondary inspection for a more 
thorough examination of eligibility to enter.

 Before IIRIRA, if immigration officials could not verify an 
alien's admissibility at secondary inspection, the alien was 
entitled to defend his eligibility at an exclusion hearing before 
an immigration judge. See 8 U.S.C. ss 1225(b), 1226(a) 
(1994). The alien had the right to counsel at the hearing, id. 
s 1362(a), could examine witnesses, id., and was provided 
with a list of persons providing free representation, 8 C.F.R. 
s 236.2(a) (1994). If the ruling were adverse, the alien could 
appeal to the Board of Immigration Appeals and, ultimately, 
federal court. See 8 U.S.C. ss 1105a(b), 1226(b) (1994).

 IIRIRA reformed the secondary inspection process in or-
der to "expedite the removal from the United States of aliens 
who indisputably have no authorization to be admitted...." 
H.R. Conf. Rep. No. 104-828, at 209 (1996). To that end, the 
statute provides that "if an immigration officer determines 
that an alien ... is inadmissible" because the alien possesses 
fraudulent documentation, see 8 U.S.C. s 1182(a)(6)(C), or has 

no valid documentation, see id. s 1182(a)(7), "the officer shall 
order the alien removed from the United States without 
further hearing or review...." Id. s 1225(b)(1)(A)(i). An 
alien removed for these reasons is barred from reentry for a 
period of five years. Id. s 1182(a)(9)(A)(i).

 The statute exempts from immediate removal aliens who 
"indicate[ ] either an intention to apply for asylum ... or a 
fear of persecution." Id. IIRIRA directs immigration offi-
cers to refer such aliens to an interview with an asylum 
officer. See id. s 1225(b)(1)(A)(ii). If the asylum officer 
"determines that an alien does not have a credible fear of 
persecution, the officer shall order the alien removed from 
the United States...." Id. s 1225(b)(1)(B)(iii)(I).2 Upon the 
alien's request, an immigration judge will review the removal 
decision. See id. s 1225(b)(1)(B)(iii)(III). The alien is given 
an opportunity to be heard and questioned in an expedited 
proceeding: "the review shall be concluded ... to the maxi-
mum extent practicable within 24 hours, but in no case later 
than 7 days after the [asylum officer's] determination...." 
Id. If the immigration judge overturns the asylum officer's 
finding, the alien is given a hearing under 8 U.S.C. s 1229a. 
If the immigration judge affirms the asylum officer's finding, 
the alien is subject to summary removal.3

 B

 The Attorney General issued Interim Regulations, effective 
April 1, 1997, setting forth procedures implementing the 
summary removal system. See, e.g., 8 C.F.R. ss 208.30, 235. 
This started the statutory time limit for judicial review run-
ning. Any action challenging the statute or the Interim 
Regulations had to be filed no later than sixty days after 
April 1. See 8 U.S.C. s 1252(e)(3)(B). Organizations who 
represent and assist aliens seeking to enter the United States 
filed two complaints challenging IIRIRA and the Interim 

__________
 2 If the asylum officer finds that there is a credible fear of 
persecution, the alien is given a full hearing under 8 U.S.C. s 1229a.

 3 At this juncture, habeas corpus review on a limited number of 
issues is available. See id. s 1252(e)(2).

Regulations as they apply to asylum-seeking aliens.4 The 
cases--American Immigration Lawyers Ass'n (AILA) and 
Liberians United for Peace and Democracy (LUPD)--were 
consolidated. A few of the same organizations joined with 
the Dominican American National Foundation (Miami area) 
and aliens to assert claims against the summary removal 
system as it applied to non-asylum seekers. This third 
case--Wood--focused on determinations, at the secondary 
inspection stage, that aliens lacked proper documentation. 
The AILA and LUPD complaints challenged the same stage 
of summary removal, but also focused on the "fear of persecu-
tion" determination and the procedures available to asylum 
seekers. In the Wood case, an amended complaint filed on 
August 28 added individual plaintiffs who were removed after 
the sixty-day deadline. The district court consolidated the 
Wood and AILA/LUPD cases.

 The complaints raised a host of contentions. Some plain-
tiffs claimed that IIRIRA violated the due process and equal 
protection rights of aliens seeking to enter the United States, 
that the Attorney General's regulations were not consistent 
with IIRIRA, and that summary removal violated internation-
al treaties protecting children and refugees. Plaintiffs rested 
their due process and statutory claims on the following allega-
tions: the summary removal procedures banned communica-
tion with family, friends, or attorneys; failed to notify aliens 
of the reasons for removal and the procedures available for 
challenging removal; failed to provide adequate language 
interpretation; and limited review of removal decisions. 

__________
 4 The organizations, each of which is an appellant, are the Ameri-
can Immigration Lawyers Association, a 4500 member association 
of immigration lawyers, and the following groups which assist either 
particular nationalities of aliens or aliens arriving in a particular 
area of the United States: Florida Immigration Advocacy Center; 
Human Rights Project (Los Angeles area); Liberians United for 
Peace and Democracy; National Coalition for Haitian Rights; New 
York Immigration Coalition; Northern California Coalition for Im-
migration Rights; World Tamil Coordinating Committee; and 
Washington Lawyers' Committee for Civil Rights and Urban Af-
fairs.

Plaintiffs also challenged the procedures as applied to specific 
individual plaintiffs, claiming that immigration officials were 
not following IIRIRA or the Interim Regulations. The only 
claim asserted on behalf of the organizations in their own 
right was that the First Amendment entitled their members 
to have access to persons subject to summary removal proce-
dures.

 The district court dismissed each of the complaints. With 
respect to individuals who missed the statutory deadline, the 
court dismissed for lack of jurisdiction, pursuant to Federal 
Rule of Civil Procedure 12(b)(1). Two remaining individual 
plaintiffs--Perlina Perez and Flor Aquino de Pacheco, both 
non-asylum seekers--filed within the sixty-day window, but 
the court dismissed their claims for failure to state a cause of 
action, under Federal Rule of Civil Procedure 12(b)(6).5 See 
18 F. Supp. 2d at 46-47, 52-60. The court found that the 
Attorney General's regulations actually provided more proce-
dural safeguards than the statute required, id. at 52-57, that 
the individuals did not have sufficient contacts with the 
United States to invoke due process rights, id. at 58-60, and 
that they failed to make the prima facie case of discrimina-
tion necessary for their equal protection challenge, id. at 60.6 
With respect to the validity of the regulations "as applied" to 
these plaintiffs, the court held that IIRIRA provided review 
only for written procedures and thus there was no jurisdiction 
to challenge the particular practices of immigration officials.7 
 

__________
 5 Plaintiffs did not challenge the constitutionality of the sixty-day 
limit, 18 F. Supp. 2d at 47 n.8, perhaps in recognition of the 
longstanding principle that determining the conditions governing 
the admission of aliens is "so exclusively entrusted to the political 
branches of government as to be largely immune from judicial 
inquiry or interference." Bruno v. Albright, 1999 WL 1082957, at 
*5 (D.C. Cir. Dec. 3, 1999) (quoting Harisiades v. Shaughnessy, 342 
U.S. 580, 588-89 (1952)).

 6 Perez and Aquino appeal only the dismissal of their statutory 
claims. See Opening Brief of Plaintiffs-Appellants at 14.

 7 The district court did not reach the international law claim 
because it found that neither the "organizational [n]or individual 

Id. at 57-58 (citing 8 U.S.C. s 1252(e)(3)(A)).

 As to the organizational plaintiffs, the district court recog-
nized, and the government conceded, standing for their First 
Amendment claim. See 18 F. Supp. 2d at 50. The court 
rejected that claim on its merits. See id. at 60-62 (citing 
Ukranian-American Bar Ass'n, v. Baker, 893 F.2d 1374 (D.C. 
Cir. 1990)). With regard to the other claims, the court found 
that the organizations alleged "speculative" injuries and did 
"not meet the causation and redressability requirements" of 
Article III standing. See 18 F. Supp. 2d at 49-50.

 II

 A

 As the cases now stand, we have appeals by the individual 
aliens who filed late and for that reason had their claims 
dismissed, and by the two non-asylum seekers (Perez and 
Aquino) who filed timely but lost for failure to state a cause of 
action. We see no reason to disturb the district court's 
analysis, and so we affirm the dismissal of these claims 
substantially for the reasons stated in the court's thorough 
opinion. See 18 F. Supp. 2d at 46-47, 52-60.

 As to the organizational plaintiffs, they have not pressed 
their First Amendment claim on appeal. This leaves only 
their contentions that the new system violates, not their 
rights or the rights of their members, but the constitutional 
and statutory rights of unnamed aliens who were or might be 
subject to the statute and regulations. In discussing why 
they do not have prudential standing to litigate these claims, 
we will not distinguish between the organizations and their 
members. See Hunt v. Washington State Apple Adver. 
Comm'n, 432 U.S. 333, 342-43 (1977). The district court 
rightly observed that, with one exception, the organizations 
and their members alleged identical injuries. The court 
rejected as too speculative the one injury asserted for associa-
tional standing but not for organizational standing--the claim 
that members of the associations might some day be subject 
to summary removal. See 18 F. Supp. 2d at 51. We agree 
__________
plaintiffs have standing to assert the International Law claim." 18 
F. Supp. 2d at 52 n.14. The plaintiffs' brief does not discuss 
standing under the treaties, so we do not consider this ruling.

with the court's conclusion and will say no more on that 
subject.

 B

 Each of the organizational plaintiffs seeks to vindicate the 
rights of unnamed third parties--namely, aliens who have 
been or will be processed pursuant to the new law and 
regulations.8 Yet one of the "judicially self-imposed limits on 
the exercise of federal jurisdiction" is "the general prohibition 
on a litigant's raising another person's legal rights." Allen v. 
Wright, 468 U.S. 737, 751 (1984). The district court, though 
holding that the individual plaintiffs could not assert the 
rights of third parties, see 18 F. Supp. 2d at 47, did not 
directly address third party standing with regard to the 
organizational plaintiffs. Instead, the court discussed the 
"zone of interests" test, an aspect of prudential standing 
distinct from third party standing. See id. at 47-49. The 
zone of interest test looks at the nature of the claims assert-
ed; third party standing focuses on who is asserting the claim 
and why the holder of the asserted right is not before the 
court. Compare Campbell v. Louisiana, 523 U.S. 392, 397-
400 (1998), with National Credit Union Admin. v. First Nat'l 
Bank & Trust Co., 522 U.S. 479, 488-99 (1998). Satisfying 
the "zone of interests" test is usually easy when the plaintiff 
is able to establish third party standing: "if the litigant 
asserts only the rights of third parties, then he may satisfy 
the zone of interests requirement by reference to the third 
parties' interest if the court determines both that the litigant 
has third party standing and that the third parties' interests 
fall within the relevant zone of interests." Haitian Refugee 
Ctr. v. Gracey, 809 F.2d 794, 811-12 (D.C. Cir. 1987) (citing 
FAIC Secs., Inc. v. United States, 768 F.2d 352, 358 (D.C. Cir. 
1985)).

 The government's brief contained nothing on third-party 
standing. Government counsel said at oral argument that 

__________
 8 Because the district court dismissed for lack of standing, there 
has been no ruling on the merits of the AILA/LUPD challenges to 
the provisions of IIRIRA dealing with aliens seeking asylum. With 
respect to Wood, there remains a due process challenge on behalf of 
non-asylum seekers having allegedly sufficient contacts with the 
United States (for example, returning legal permanent residents).

there was no intention to waive an objection on this ground. 
Normally the proper method of preserving an argument on 
appeal is to make it. But in this circuit we treat prudential 
standing as akin to jurisdiction, an issue we may raise on our 
own, in part because the doctrine serves the "institutional 
obligations of the federal courts." Animal Legal Defense 
Fund v. Espy, 23 F.3d 496, 499 (D.C. Cir. 1994); see also 
Steffan v. Perry, 41 F.3d 677, 697 & n.20 (D.C. Cir. 1993) (en 
banc); cf. United States v. Pryce, 938 F.2d 1343, 1351 (D.C. 
Cir. 1991) (Randolph, J., concurring).

 Since we will consider third party standing sua sponte, a 
preliminary question needs to be addressed. "Congress may 
grant an express right of action to persons who would other-
wise be barred by prudential standing rules." Warth v. 
Seldin, 422 U.S. 490, 501 (1975); see also Havens Realty 
Corp. v. Coleman, 455 U.S. 363, 372 (1982); Fair Employ-
ment Council of Greater Washington, Inc. v. BMC Mktg. 
Corp., 28 F.3d 1268, 1278 (D.C. Cir. 1994). Has it done so 
here? We think not. Nothing in IIRIRA supports the idea 
that Congress intended to allow litigants to assert the rights 
of others, and there are indications that Congress meant to 
preclude such suits.

 The statute permits judicial review of the "implementation" 
of 8 U.S.C. s 1225(b), the provision spelling out the proce-
dures for inspecting applicants for admission to the United 
States. 8 U.S.C. s 1252(e)(3)(A). The judicial review section 
states that such lawsuits may be brought only in the United 
States District Court for the District of Columbia; that the 
lawsuits are limited to determining whether the statute or 
regulations are constitutional, and whether the regulations or 
other guidelines are consistent with the statute or other law; 
and that the lawsuits must be brought within the sixty-day 
period we have described earlier. 8 U.S.C. ss 1252(e)(3)(A) 
& 1252(g). We cannot see anything in these provisions 
allowing litigants--whether individuals or organizations--to 
raise claims on behalf of those not party to the lawsuit.

 The district court, in ruling that Congress had relaxed the 
zone of interest test, stressed the sixty-day time limit on 

judicial review: "such an action would probably not be 
brought in time if Congress intended that only aliens subject 
to summary removal orders be allowed to bring such an 
action." 18 F. Supp. 2d at 49. This is a large stretch, 
especially in light of the fact that some aliens did bring suit 
within the period. A sixty-day limit is commonplace for 
judicial review of agency action. The Hobbs Act, 28 U.S.C. 
s 2344, is a well-known example. No one has ever thought 
that this time limit, in itself, amounted to a legislative repudi-
ation of prudential standing. See, e.g., Reytblatt v. NRC, 105 
F.3d 715, 720 (D.C. Cir. 1997); Water Transport Ass'n v. ICC, 
819 F.2d 1189, 1193 & n.33 (D.C. Cir. 1987); National 
Treasury Employees Union v. Merit Sys. Protection Bd., 743 
F.2d 895, 910 (D.C. Cir. 1984); United States v. FMC, 655 
F.2d 247, 251 (D.C. Cir. 1980). In each of the cases just cited 
the sixty-day period for judicial review under the Hobbs Act 
applied and yet we still required the petitioners to satisfy 
prudential standing requirements.

 We have also considered another argument, although it was 
not mentioned in the district court's opinion. Washington, 
D.C., one might suppose, is hardly a convenient forum for an 
alien removed from, say, a port of entry in Hawaii or Califor-
nia or Florida. Yet--to continue the argument--Congress 
restricted judicial review to actions brought in the federal 
court in the District of Columbia, see 8 U.S.C. s 1252(e)(3)(A), 
thereby signifying that organizations, rather than (or perhaps 
in addition to) individual aliens, may bring suit. The argu-
ment is not very telling. For one thing, plaintiffs themselves 
alleged that Washington is one of the "major locations for 
summary removal cases." LUPD/AILA Amended Complaint 
p 85. For another, aliens who have been summarily removed 
might be from anywhere in the world, regardless of where 
they attempt to enter the country. When they have been 
returned to their native country, Washington, D.C. is not 
necessarily less convenient than any other forum. And once 
again, it has been common for Congress to designate the 
District of Columbia as the exclusive venue for judicial review 
of agency action. See, e.g., 12 U.S.C. s 2278a-3b (Farm 
Credit System Assistance Board); 30 U.S.C. s 1276(a)(1) 
(Surface Mining Act nationwide rules); 42 U.S.C. s 7607(b)(1) 

(Clean Air Act regulations); 47 U.S.C. s 402(b) (FCC licens-
ing decisions). The purpose is obvious and has nothing to do 
with prudential standing. By confining judicial review to one 
venue, Congress avoids conflicting decisions about the validity 
of particular regulations or statutes.

 When we examine other subsections of 8 U.S.C. s 1252(e) 
dealing with judicial review, we find signs that Congress 
meant to allow actions only by aliens who have been subjected 
to the summary procedures contained in s 1225(b) and its 
implementing regulations. Section 1252(e)(1)(B) provides: 
"Without regard to the nature of the action or claim and 
without regard to the identity of the party or parties bringing 
the action, no court may ... certify a class under Rule 23 of 
the Federal Rules of Civil Procedure in any action for which 
judicial review is authorized under a subsequent paragraph of 
this section." Contrast this prohibition on class actions with 
the allegations of the organizational plaintiffs. The LUPD/
AILA amended complaint (pp 96, 99, 103) raises claims on 
behalf of all "bona fide refugees" and "all aliens who may be 
eligible" for asylum interviews. The Wood amended com-
plaint (pp 1, 6, 79, 80, 85) raises claims on behalf of the alien 
"clients" of the organizational plaintiffs and "those persons 
similarly situated who have been and will be harmed by the 
new expedited removal proceedings created by INA s 235 
and governed by the Interim Rules and Defendants' other 
implementing policies and procedures," a group that includes 
"United States citizens, lawful permanent residents ('LPRs'), 
and those other persons eligible for admission to the United 
States, including non-immigrant visa holders with facially 
valid visas, parolees, unaccompanied minors, refugees, asy-
lees, those persons for whom documents are not required for 
admission, and those potentially eligible for admission 
through waivers, adjustment of status or other benefits under 
the INA."

 Such unbounded allegations sweep in nearly all aliens 
anywhere in the world who have tried or will try to enter the 
United States. The situation of any particular alien is of no 
moment, and imposes no confining influence on the scope of 
the lawsuit. What portions of the statute and regulations will 

be challenged, and on what grounds, are totally in the control 
of the organizations and their lawyers. Should we suppose 
that Congress, having barred class actions, intended to per-
mit actions on behalf of a still wider group of aliens, actions in 
which no class representative appears as a party and the 
plaintiffs are unconstrained by the requirements of Federal 
Rule of Civil Procedure 23? From all we can gather, Con-
gress must have contemplated that lawsuits challenging its 
enactment would be brought, if at all, by individual aliens 
who--during the sixty-day period--were aggrieved by the 
statute's implementation. We come to this conclusion not 
only in light of the statute's ban on class actions, but also 
because Congress restricted injunctive relief in the following 
terms: "no court (other than the Supreme Court) shall have 
jurisdiction or authority to enjoin or restrain the operation of 
[the expedited secondary inspection provisions] other than 
with respect to the application of such provisions to an 
individual alien against whom the proceedings under such 
chapter have been initiated." 8 U.S.C. s 1252(f)(1). The 
jurisdictional provision provides still further proof: "Except 
as provided in this section and notwithstanding any other 
provision of law, no court shall have jurisdiction to hear any 
cause or claim by or on behalf of any alien arising from the 
decision or action by the Attorney General to commence 
proceedings, adjudicate cases, or execute removal orders 
against any alien under this Act." 8 U.S.C. s 1252(g). One 
cannot come away from reading this section without having 
the distinct impression that Congress meant to allow litiga-
tion challenging the new system by, and only by, aliens 
against whom the new procedures had been applied.

 What we have just written about congressional intent influ-
ences our analysis of the judicially-created third party stand-
ing doctrine as it applies to the cases before us. We will get 
to this in a moment, but first we need to look at developments 
in this circuit and in the Supreme Court. The place to begin 
is Judge Bork's opinion in Haitian Refugee Center v. Gracey, 
809 F.2d 794 (D.C. Cir. 1987), which describes a lawsuit quite 
similar to the cases before us. There, organizations chal-
lenged a presidential proclamation ordering interdiction of 
boats carrying undocumented aliens attempting to enter the 

United States. The organizations complained that the inter-
diction program violated the rights of the aliens under the 
Refugee Act of 1980, the due process clause of the Fifth 
Amendment, and various treaties. See 809 F.2d at 797-98. 
Because the litigants asserted the rights of third party aliens, 
Judge Bork conducted a thorough examination of cases in 
which the Supreme Court made exceptions to the traditional 
prohibition against third party standing. See id. at 807-11. 
The analysis led to the following conclusion: "If the govern-
ment has directly interfered with the litigant's ability to 
engage in conduct together with the third party, for example, 
by putting the litigant under a legal disability with criminal 
penalties, and if a statute or the Constitution grants the third 
party a right to engage in that conduct with the litigant, the 
litigant has standing to challenge the government's interfer-
ence by invoking the third party's rights." Id. at 808. Most 
of the cases allowing third party standing involved laws that 
imposed legal sanctions on the litigant.9 Third party stand-
ing was allowed because "enforcement of the challenged 
restriction against the litigant" resulted "in the violation of 
the third parties' rights." Id. (quoting Warth, 422 U.S. at 
510)). This circumstance eliminates one of the concerns 
animating the third party prohibition: courts should not 
decide disputes if third parties will be able to exercise their 
rights regardless of the litigant's success. See Singleton v. 
Wulff, 428 U.S. 106, 114 (1976) (citing Ashwander v. TVA, 297 

__________
 9 As examples, see Secretary of State of Maryland v. J.H. Mun-
son Co., 467 U.S. 947, 955-59 (1984), in which a fundraiser had 
standing to raise the First Amendment rights of donors because the 
statute penalized fundraisers for receiving commissions; Craig v. 
Boren, 429 U.S. 190, 194-97 (1976), in which the Court recognized 
standing for a beer vendor to assert the equal protection claims of 
males who were not allowed to purchase beer until they turned 21, 
although women could purchase beer upon turning 18; Doe v. 
Bolton, 410 U.S. 179, 188-89 (1973), in which doctors were allowed 
to assert the privacy interests of patients because the statute 
imposed criminal penalties on doctors performing abortions; and 
Eisenstadt v. Baird, 405 U.S. 438, 443-46 (1972), in which vendors 
of contraceptives had standing to assert purchasers' privacy inter-
ests because the statute criminalized selling contraceptives.

U.S. 288, 345-48 (1936) (Brandeis, J., concurring)). The 
direct impact of the law on the litigant also mitigates the 
concern that third parties would be better proponents of their 
own rights. See id. (citing Holden v. Hardy, 169 U.S. 366, 
397 (1898)).

 The Supreme Court has also recognized third party stand-
ing when a law, though not punishing the litigant, directly 
interferes with a protected relationship between the litigant 
and third party. Singleton v. Wulff, in which doctors chal-
lenged a law that prohibited Medicaid payments for abortions 
that were not "medically indicated," is such a case. See 428 
U.S. at 106. In a plurality opinion,10 Justice Blackmun found 
that the law was "specifically intended to burden the third 
party's relationship with their physicians." Haitian Refugee 
Ctr., 809 F.2d at 810 (citing Singleton, 428 U.S. at 106). 
Because the right being asserted--the third party patient's 
Roe v. Wade right--was a right protecting the patient's 
access to physicians, the Court recognized third party stand-
ing.

 In contrast, the interdiction law at issue in Haitian Refugee 
did not directly interfere with the relationship between Hai-
tians and the litigants who were trying to help them. See id. 
Impeding contact between the two groups was only an indi-
rect effect of the interdiction program's aim of preventing the 
entry of Haitians. See id. at 809-10. Yet "allowing standing 
for unintended side effects of programs would involve the 
court in the continual supervision of more governmental 
activities than separation of powers concerns should permit." 
Id. Moreover, the constitutional rights asserted--the Hai-
tians' due process rights--did not protect a relationship be-
tween the litigants and the aliens. See id. at 809. The same 
is true in our case. The organizations faced no legal sanction 
from the statute or the regulations. The claimed violation of 
aliens' rights--impeded access to attorneys--is but a side 
effect of the expedited removal system.

 In addition to the factual congruity between Haitian Refu-
gee and this case, the rule of decision Judge Bork announced 

__________
 10 Justice Stevens, the fifth vote for standing, wrote separately on 
the grounds that the doctors were asserting their own rights.

for the court11 would foreclose the organizational plaintiffs 
from litigating the due process rights of unnamed aliens. 
Haitian Refugee held: "A litigant therefore could never have 
standing to challenge a statute solely on the ground that it 
failed to provide due process to third parties not before the 
court." Id.12

 Nonetheless, plaintiffs argue that one of our recent deci-
sions is squarely at odds with the rule of Haitian Refugee 
just quoted. They have a point. A few months ago, this 
court--without mentioning Haitian Refugee--allowed a liti-
gant to assert the due process rights of third parties. See 
Lepelletier v. FDIC, 164 F.3d 37 (D.C. Cir. 1999). The 
plaintiff in Lepelletier was a "money finder," a person who 
receives income by locating the owners of unclaimed deposits 
at failed banks. Lepelletier filed suit against the FDIC, the 
receiver of three failed banks, after the agency denied his 
Freedom of Information Act requests for the names of the 
owners of the unclaimed deposits. See id. at 40-41. The 
complaint alleged that "under the due process clause of the 
Fifth Amendment, the FDIC was required to publish the 
names of all parties with unclaimed deposits before forfeiting 
the funds...." Id. at 41. Because the unidentified deposi-
tors' property interest gave rise to the due process claim, 
Lepelletier had to overcome third party standing doctrine. 
See id. at 42.

 The Lepelletier court invoked, without discussion, the 
three-part test for third party standing the Supreme Court 

__________
 11 Judge Buckley joined this portion of Judge Bork's opinion, see 
809 F.2d at 796 n.1, and it therefore represented the law of the 
circuit.

 12 At oral argument, plaintiffs cited National Cottonseed Products 
Ass'n v. Brock, 825 F.2d 482 (D.C. Cir. 1987), the one opinion of this 
circuit to question Haitian Refugee. But the doubt expressed there 
has no bearing on this case. It dealt with the portion of Judge 
Bork's Haitian Refugee opinion dealing with whether third party 
standing automatically attached to a vendor-vendee relationship.

announced in Powers v. Ohio, 499 U.S. 400 (1991). See 164 
F.3d at 43. Powers allowed a criminal defendant to assert a 
claim of racial discrimination in jury selection because: 1) the 
defendant suffered an injury in fact;13 2) he had a close 
relationship to the excluded jurors; and 3) there was some 
hindrance to the excluded jurors asserting their own rights. 
499 U.S. at 411; see also Campbell v. Louisiana, 523 U.S. 392 
(1998) (applying Powers in the grand jury context).

 Did Powers supersede the Haitian Refugee rule? The 
defendant in Powers certainly faced a legal penalty (imprison-
ment), but it is not clear that a juror's equal protection rights 
"protect that party's relationship with the litigant." Haitian 
Refugee, 809 F.2d at 809. The Powers Court referred to "the 
relation between petitioner and excluded jurors," Powers, 499 
U.S. at 413, but the jurors' equal protection rights were 
treated principally as a protection of the integrity of the 
judicial system, see id. at 412, 414. It could be that Haitian 
Refugee and Powers now coexist and a party can establish 
third party standing by meeting either standard. A post-
Powers decision of this court appears to take this approach. 
Fair Employment Council continued to apply the Haitian 
Refugee "relationship" standard, see Fair Employment Coun-
cil, 28 F.3d at 1280 (quoting Haitian Refugee, 809 F.2d at 
809)), but applied that standard only after deciding that 
plaintiffs could not meet the Powers "obstacle" test, see id.

 The effect of subsequent case law on the Haitian Refugee 
rule is not entirely clear. Nor is the general state of third 
party standing law. See Miller v. Albright, 523 U.S. 420, 454 
n.1 (1998) (Scalia, J., concurring) ("Our law on [third-party 
standing] is in need of what may charitably be called clarifica-
tion.").14 Although we are unsure how to reconcile Haitian 

__________
 13 We cannot see what this factor adds. Prudential standing 
aside, if the litigant has not suffered injury there is no constitutional 
standing. See Valley Forge Christian College v. Americans United 
For Separation of Church & State, Inc., 454 U.S. 464, 472 (1982).

 14 A third party standing decision of the Supreme Court after 
Haitian Refugee allowed an attorney to assert the due process 

Refugee with Powers and Lepelletier, we can decide this 
appeal without making the attempt. Even under the Powers 
formulation, the organizational plaintiffs cannot prevail. To 
establish third party standing "there must exist some hin-
drance to the third party's ability to protect his or her own 
interests."15 Powers, 499 U.S. at 411. Singleton v. Wulff, 
428 U.S. at 116, sounded a similar note: "If there is some 
genuine obstacle ... the third party's absence from court 
loses its tendency to suggest that his right is not truly at 
stake, or truly important to him, and the party who is in court 
becomes by default the right's best available proponent." We 
do not believe excluded aliens suffered from the type of 
impediment, the "hindrance" or "obstacle," the Court had in 
mind.

 We accept plaintiffs' statement that "aliens removed direct-
ly from secondary inspection are detained and prohibited 
from communicating with anyone throughout their stay in the 

__________
claims of his client. See United States Dep't of Labor v. Triplett, 
494 U.S. 715 (1990). The law being challenged regulated the fees 
an attorney could receive in black lung disease cases. Triplett thus 
is another example of the well-established exception that a litigant 
can assert third party claims when the challenged law imposes a 
penalty on the litigant.

 Miller v. Albright, 523 U.S. 420 (1998), also involved a legal 
disability imposed on the litigant. The plaintiff had been denied 
citizenship on the basis of a proof-of-paternity requirement for 
illegitimate, foreign-born offspring of American fathers. The Court 
allowed the plaintiff to raise her father's equal protection claim (a 
test was not required for the illegitimate, foreign-born offspring of 
American mothers). See id. at 424-27.

 15 This language demonstrates that when the "Powers test" is 
applied, all three requirements must be met. See also Powers, 499 
U.S. at 411 ("We have recognized the right of litigants to bring 
actions on behalf of third parties, provided three important criteria 
are satisfied...."). Caplin & Drysdale, Chartered v. United 
States, 491 U.S. 617, 623 n.3 (1988), which upheld third party 
standing even though the hindrance requirement "counsel[ed] 
against review," appears inconsistent with the Court's current 
approach.

country." Opening Brief for Plaintiffs-Appellants at 46. But 
the period of detention typically was quite short; that is the 
point of summary removal. When an alien returned to his 
native country, nothing prevented him from bringing suit 
here. To this the organizational plaintiffs reply that "under 
the construction of the 60-day limit adopted by the district 
court, for those aliens arriving after June 1, 1997, there is no 
possibility of bringing a challenge at all." Id. at 47. True 
enough. But this is precisely what Congress intended.

 None of the Supreme Court's decisions invoking the Pow-
ers formulation even comes close to suggesting what plaintiffs 
propose. In Powers itself, the third party juror "possess[ed] 
little incentive" to bring suit because "of the small financial 
stake involved and the economic burdens of litigation." 499 
U.S. at 415. It also would have been difficult for the excluded 
juror to recognize, and later prove, that his exclusion was the 
result of systemic discrimination. See id. at 414-15; see also 
Barrows v. Jackson, 346 U.S. 249, 254, 257 (1953) (allowing 
third party standing to vindicate the rights of "unidentified" 
victims of racially restrictive covenant). This latter consider-
ation--unawareness of the injury--is the type of obstacle 
Lepelletier thought adequate to meet the Powers standard. 
The third parties in Lepelletier were unidentified depositors 
who did not know they were being deprived of property. 
Excluded aliens faced no comparable impediment to suit. 
They were quite aware of their summary removal. And they 
had a strong incentive to challenge the exclusion procedures 
in court.

 Justice O'Connor, joined by Justice Kennedy, has said that 
when a "hindrance signals that the rightholder did not simply 
decline to bring the claim on his own behalf, but could not in 
fact do so," third party standing may be permitted. Miller v. 
Albright, 523 U.S. at 450 (O'Connor, J., concurring). Hodel v. 
Irving, 481 U.S. 704, 711-12 (1987), involves the most obvious 
application of this principle: the rightholders, the litigants' 
parents, were deceased. Another case, Singleton, 428 U.S. at 
117, held that the "imminent mootness" of any woman's 
claimed right to an abortion posed an obstacle to her asser-

tion of the right. And the Court permitted third party 
standing when assertion of the right would essentially defeat 
it. See NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 
459 (1958) (recognizing that if the organization were required 
to assert its own privacy interests, the privacy it sought to 
protect would be undermined).

 We do not believe aliens excluded in the Spring of 1997, 
when the statute was first implemented, were in a position 
comparable to the missing individuals in the cases we have 
just summarized. Congress passed IIRIRA in September 
1996. The organizations appearing before us, whose purpose 
it is to assist aliens arriving on our shores, thus knew well 
ahead of time what was coming. On March 27, 1997, five 
days before the implementing regulations went into effect, 
the American Immigration Lawyers Association and three 
other organizations filed suit. They eventually added, within 
60 days of April 1, the two excluded aliens whose claims the 
district court adjudicated on the merits. The organizations 
do not allege that, despite their best efforts, they were unable 
to identify and provide legal assistance to any other potential 
plaintiffs--that is, aliens facing removal during the relevant 
time frame. How large was the pool? The government 
informed us after argument that in the 60 days beginning 
April 1, 1997, immigration officials processed approximately 
10,200 expedited removal cases at the country's 25 largest 
ports of entry--or 1200 per week.

 To the extent there were obstacles or hindrances to any of 
these individuals joining in the cases, they are either imposed 
by Congress or result from the normal burdens of litigation. 
Those who are not financially well off face obvious obstacles 
when they seek to bring a lawsuit. Some excluded aliens, but 
hardly all,16 doubtless fell into that category. Those who are 

__________
 16 For instance, the excluded aliens added in the amended Wood 
complaint included two British citizens who supplied items to U.S. 
Air Force squadrons in England; a citizen of the Peoples Republic 
of China who is the president of a real estate development company; 
a businesswoman from Canada; and another Canadian citizen who 

uninformed about the workings of the courts, or of their legal 
rights, or of the availability of counsel, also face obstacles. 
Individuals who do not speak English or who reside far from 
the courthouse are hindered when it comes to taking legal 
action. Congress knew all this as well as we do, and as well 
as the organizational plaintiffs do. Yet rather than alleviating 
these burdens Congress placed strict limits on the time for 
filing challenges to the summary removal system, and it 
barred class actions. To allow third party standing in the 
face of those provisions (which are not challenged) and the 
jurisdictional provision mentioned earlier (p. 12, supra) would 
be to contradict the principles on which the standing doctrine 
rests--namely, "the proper--and properly limited--role of 
the courts in a democratic society." Warth v. Seldin, 422 
U.S. at 498; Allen v. Wright, 468 U.S. at 750-52. Congress 
imposed the 60-day limit on actions in order to cabin judicial 
review and to have the validity of the new law decided 
promptly. It would be inconsistent with the "properly limited 
role of the courts" for us to use this provision as the basis for 
expanding jurisdiction through the back door of third party 
standing. And in the face of a statute barring even class 
actions that comply with the rules of procedure, it would be 
inconsistent, indeed almost contradictory, if the device of 
third party representation could be used to prosecute what 
are essentially unbounded class lawsuits.

 We mentioned earlier that Congress may relax the pruden-
tial standing rules the judiciary has created. See Warth v. 
Seldin, 422 U.S. at 501; Havens Realty Corp. v. Coleman, 
455 U.S. at 372; Fair Employment Council, 28 F.3d at 1278. 
Congress may do so--and has sometimes done so--in the 
exercise of its Article I power, so long as it keeps within the 
limits of Article III of the Constitution. See Henry P. 
Monaghan, Third Party Standing, 84 Colum. L. Rev. 277, 313 
& n.195 (1984). If Congress can thus expand federal jurisdic-
tion, Congress also has the power to contract federal jurisdic-
tion. There is no reason why, for instance, a statute could 

__________
held a degree in hotel/restaurant management from an American 
university.

not expressly state that, without exception, each party to a 
lawsuit must raise only their rights and not the rights of 
others. That would constitute a legislative direction to the 
courts that the third party standing doctrine, in its strictest 
form, must be applied. Congress may not have gone so far in 
IIRIRA. But our analysis of the statute, and particularly the 
bar on class actions, strengthens the judicial presumption 
against suits seeking relief for a large and diffuse group of 
individuals, none of whom are parties to the lawsuit--suits, 
that is, such as the ones before us. For all of these reasons, 
we hold that the plaintiff organizations do not have standing 
to raise claims, whether statutory or constitutional, on behalf 
of aliens subjected to IIRIRA's expedited removal system.

 Affirmed.